Daniel J. O'BRIEN, Appellant-Defendant,

v.

STATE of Indiana, Appellee-Plaintiff.

No. 1–181A24.

Court of Appeals of Indiana,
Fourth District.

July 7, 1981.

William C. Moyer, New Albany, for appellant-defendant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

Daniel O'Brien is appealing his conviction by a six-member Clark County jury for possession of more than 30 grams of marijuana, IC 35–48–4–11 [1] a class D felony. O'Brien contends the Indiana statute which

1. "35–48–4–11. Possession of marijuana.—A person who:

(1) Knowingly or intentionally possesses marijuana, hash oil, or hashish;

permits a six-member jury to determine the facts in a felony case is unconstitutional. Moreover, he contends the evidence at trial was insufficient to convict him and testimony was admitted erroneously.

We affirm the conviction and find no constitutional infirmity.

### ISSUES

The following specific issues are presented for our review:

1. Does IC 35–1–30–1,[2] which requires twelve-member juries in all criminal cases except those heard in county court, violate the equal protection clauses of the United States and Indiana Constitutions?

2. Was sufficient evidence presented to adequately identify the defendant at trial as the person accused and to establish the element of possession?

3. Was it error for the trial court to allow the arresting officer to testify about incriminating statements made by O'Brien without first conducting a hearing on whether those statements had been made voluntarily?

### I. CONSTITUTIONALITY OF SIX–MEMBER JURY

In 1975 the Indiana General Assembly created a county court system with jurisdiction over minor civil and criminal matters, including misdemeanors and infractions. IC 33–10.5–3–1. The statute also provided for six-member juries in the county courts, a provision specifically held to be constitutional by the Indiana Supreme Court. IC 33–10.5–7–6,[3] *In the Matter of Public Law No. 305 and Public Law No. 309*, (1975) 263

Ind. 506, 334 N.E.2d 659, 663 (hereinafter called *The Public Law 305 Case*).

In 1979 the jurisdiction of county courts was extended by the legislature to include class D felonies. IC 33–10.5–3–1(a)(3). However, circuit and superior courts retained concurrent jurisdiction with the county courts. Consequently class D felony defendants can face either a twelve-member jury or a six-member jury at the discretion of the prosecutor and the trial judges. The prosecutor initially may choose the forum, but possible transfer to the other court of concurrent jurisdiction is left to the discretion of the judges involved. IC 33–10.5–3–5.

The prosecutor here charged O'Brien with a class D felony in Clark County Court. The record does not indicate O'Brien sought a transfer to the circuit court. Rather it shows he asked for a twelve-member jury in the county court. That motion was denied, and the trial proceeded with a jury of six.

O'Brien argues that a twelve-member jury in a felony case is a fundamental, constitutional right. He contends the statute gives the prosecutor the power to arbitrarily decide whether a felony defendant will have a jury of twelve or six. Accordingly, the statute allows similarily situated felony defendants to be classified differently with neither a compelling nor rational state interest to justify the differing treatment.

We disagree.

Since our Supreme Court has already found constitutional the basic classification scheme of the County Court Act permitting six-member juries in minor criminal cases,

---

commits possession of marijuana, hash oil, or hashish, a class A misdemeanor. However, the offense is a class D felony (i) if the amount involved is more than thirty [30] grams of marijuana . . . ."

2. "35–1–30–1. Civil and criminal cases.—The trial jury used in civil cases shall act also in criminal cases, but must in criminal cases con-

sist of twelve [12] qualified jurors, except as provided in IC 33–10.5–7–6."

3. "33–10.5–7–6. Number of jurors.—Jury trial in the county court, whether in civil or criminal cases, shall consist of a six [6] man jury. When a jury trial is demanded the county court may call a jury from the list provided and used by the circuit court."

the only question left is whether the holding in *The Public Law 305 Case* can be extended to class D felony cases as well.

Before *The Public Law 305 Case*, six-member juries were considered to be unconstitutional in Indiana. *Miller's Nat'l Ins. Co. v. America State Bank of East Chicago*, (1934) 206 Ind. 511, 190 N.E. 433. The decision to change Indiana law to conform to the U.S. Supreme Court's opinion in *Williams v. Florida*, (1970) 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 was a bold step not made by every jurisdiction. *See Advisory Opinion*, (1971) 108 R.I. 628, 278 A.2d 852, 47 A.L.R.3d 878. The change meant the court would no longer consider the twelve-member jury an indispensable component of the Constitution. Rather, any inquiry about the required number of jurors would be based on the function of the jury and its relation to the purposes of the jury trial. *Williams v. Florida*, 90 S.Ct. at 1905.

The purpose of a jury in felony cases is no different from its purpose in misdemeanor or civil cases. The purpose is to provide an accused with a safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. *Duncan v. Louisiana*, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491.

"Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. The performance of this role is not a function of the particular number of the body that makes up the jury. To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community. But we find little reason to think these goals are in any meaningful sense less likely to be achieved when the jury numbers six than when it numbers twelve—particularly if the requirement of unanimity is retained. And, certainly the reliability of the jury as a factfinder hardly seems likely to be a function of its size."

*Williams v. Florida*, 90 S.Ct. at 1906.

O'Brien's basic assumption apparently is that the defendant has a greater advantage with a twelve-member jury since he has more chances to find a juror who will insist on acquittal. The U.S. Supreme Court addressed that concern directly in *Williams v. Florida* as follows:

"What few experiments have occurred—usually in the civil area—indicate that there is no discernible difference between the results reached by the two different-sized juries. In short, neither currently available evidence nor theory suggests that the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members.

Similarly, while in theory the number of viewpoints represented on a randomly selected jury increases, in practice the difference between the 12-man and the six-man jury in terms of the cross-section of the community represented seems likely to be negligible. Even the 12-man jury cannot insure representation of every distinct voice in the community, particularly given the use of the peremptory challenge. As long as arbitrary exclusions of a particular class from the jury rolls are forbidden, see, *e. g., Carter v. Jury Commission*, 396 U.S. 320, 329–330, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970), the concern that the cross-section will be significantly diminished if the jury is decreased in size from 12 to six seems an unrealistic one.

We conclude, in short, as we began: the fact that the jury at common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.' "

*Williams v. Florida, supra* at 399 U.S. 102–03, 90 S.Ct. 1906–07.

 It was apparently in view of this reasoning that our Supreme Court found no constitutional impediment to the six-member jury in county courts with concurrent misdemeanor jurisdiction, and it is this reasoning that now supports the same conclusion for county courts with concurrent class D felony jurisdiction. While a felony defendant has a constitutional right to a jury trial, nothing in the federal or Indiana constitutions guarantees him a specific number of jurors. There is, in effect, no constitutional difference between a six-member jury and a twelve-member jury so long as each provides the requisite safeguard against overzealous prosecutors and eccentric judges.

 Fundamental rights are those which have their origin in the express terms of the constitution or which are necessarily to be implied from those terms. *Sidle v. Majors,* (1976) 264 Ind. 206, 341 N.E.2d 763. The right asserted by O'Brien is not such a right.

 The equal protection provisions of the state and federal constitutions are designed to prevent the distribution of extraordinary benefits or burdens to any group. *Sidle v. Majors, supra.* Our courts have required only that legislative classifications meet certain tests. Where a fundamental right is not involved, the standard of review is that the classification not be arbitrary or unreasonable and that a "fair and substantial" relationship exist between the classification and the purpose of the legislation creating it. *Sidle v. Majors, supra.*

The County Courts Act, as amended, permits two classifications of class D felony defendants—those tried in county court with a six-person jury and those tried in circuit, superior or criminal courts with a twelve-member jury. The treatment of the two groups is, for practical purposes, identical. Whatever inequity may exist is not patent. No showing has been made nor authority brought to the attention of this court that the numerical size of a jury

larger than five has any bearing on the outcome of a trial. Consequently the classification is not unreasonable.

 The logical legislative purpose for extending county court jurisdiction to include class D felonies is to relieve congestion in the circuit and superior courts and to provide a speedier, more efficient and less expensive forum for handling relatively less serious felonies. In light of this purpose and the principle that either six or twelve-member juries are equally capable of providing safeguards for the defendant, we hold that using two existing court systems, where the only relevant difference is the number of jurors, is reasonably, fairly and substantially related to a legitimate state interest in promoting the fair and efficient administration of justice.

## II. SUFFICIENCY OF THE EVIDENCE

O'Brien maintains the evidence was insufficient because no in-court identification was made to establish his connection with the crime. Moreover, the defendant argues the evidence was insufficient to establish constructive possession of marijuana.

The evidence and inferences therefrom most favorable to the State discloses the following facts:

Clarksville police received a tip from an informant that O'Brien had marijuana at his house. The police obtained a search warrant and at 5:30 p. m. on January 16, 1980, two officers parked near the house to observe. They saw numerous persons entering and leaving. About 8:45 p. m., seven officers, including the chief of detectives, Richard Miley, approached the front and side doors. They knocked and announced they were police officers. When there was no response, they forced their way in.

Upon entering, the police found six persons sitting in the living room and three in the kitchen. The two bedrooms were empty.

Officer Miley entered the kitchen and asked if the owner of the residence was

there. One of the three sitting at the kitchen table said he was the owner and his name was Daniel O'Brien. The officers then proceeded with the search. They found less than 30 grams of marijuana in a dresser drawer of the northwest bedroom. Nothing else was in any of the drawers and only several shirts, a jacket and a satchel was in the closet. They found more than 30 grams in a dresser drawer in the southwest bedroom and a pound bag of marijuana under a coat on the kitchen counter about 10 feet from the three persons at the table.

Only O'Brien was arrested. Two juveniles were taken to the police station and released to their parents.

While the record does not unequivocally indicate Officer Miley pointed to O'Brien at trial to identify him as the person who committed the crime, Miley nevertheless referred to "Danny O'Brien" several times as the person he met in the kitchen and whom he arrested. The names "O'Brien" and "the Defendant" were used interchangeably during trial by Miley and by defense counsel. For example, on cross-examination of Miley, the defense asked:

"Q. When you arrested the Defendant did he put that brown coat on and take it to the jail?

A. I do not recall, sir.

Q. Did you book the Defendant?

A. No, sir. Personally I did not. Detective Whiggington did."

And later:

"Q. So Danny O'Brien and two juveniles were the only ones who were the focus of any police action?

A. Yes, sir."

Officer Miley also testified on direct examination:

"A. I asked if the owner of the residence was here. I got a reply. I asked if the subject's—the subject's name and I also received a reply from the Defendant.

Q. And what was the Defendant's reply?

A. He stated that he was the owner of the house and his name was Daniel O'Brien."

In Indiana it is sufficient to identify a defendant at trial by name. *State v. Schroeppel*, (1959) 240 Ind. 185, 162 N.E.2d 683. In this case, Miley testified the defendant had identified himself to him as Danny O'Brien, and that Danny O'Brien was the person he arrested and charged with possession of marijuana. The record shows Danny O'Brien was in the courtroom with his attorney, and no mention was made of any person other than the defendant bearing that name.

O'Brien also contends the evidence at trial was not sufficient to establish constructive possession of marijuana. He contends he did not have exclusive control of the premises because he was one of nine persons present when the police arrived, and no additional circumstances support an inference that he knew about or controlled the marijuana found in his home.

While exclusive control of the premises creates an inference of knowledge and control of the contents of the premises, when a defendant does not exclusively control the premises, his intent and ability to control the contents may be inferred only when other circumstances buttress such an inference. *Thomas v. State*, (1973) 260 Ind. 1, 291 N.E.2d 557; *Martin v. State*, (1978) Ind.App., 372 N.E.2d 1194; *Greely v. State*, (1973) 158 Ind.App. 212, 301 N.E.2d 850.

As to the pound bag of marijuana in the kitchen, we agree with the defendant that no evidence was offered to show any behavior by O'Brien or special circumstances to indicate he knew it was there or had it within his control. Mere presence in the vicinity or association with one having possession of drugs is not sufficient to sustain a conviction. *Martin v. State, supra.*

However, the marijuana in the bedrooms presents a different situation. The jury was entitled to infer from the

testimony presented by the state that O'Brien did not share his bedrooms or his dressers. In the northwest bedroom, no personal effects were stored except in a closet, where police found only several shirts, a jacket and a satchel. Nothing in the evidence indicates he had a roommate or that his bedrooms were routinely accessible to outsiders. None of the eight guests was found in either bedroom. The jury could have reasonably concluded that everyone present was a casual visitor, that O'Brien lived at the house, and that only the southwest bedroom was used by an occupant. Because bedrooms are usually private areas of a house and dresser drawers are especially private, evidence indicating sole occupancy of a bedroom supports a logical inference of control and knowledge of the room's contents by the usual occupier. In O'Brien's case, the evidence provided no commonsense basis for the contrary inference that anyone other than O'Brien had access to the bedroom dresser drawers. The evidence was sufficient to justify a jury's conclusion that O'Brien knew about and intended to possess more than 30 grams of marijuana in the private areas of his home.

### III. HEARING ON VOLUNTARINESS

Finally, O'Brien contends Officer Miley's testimony concerning O'Brien's admission of ownership should not have been permitted without first conducting a hearing to test whether the statement was voluntary.

By statute, Indiana courts must conduct a hearing on the voluntariness of admissions made after arrest and during interrogation. IC 35-5-5-1, IC 35-5-5-4, IC 35-5-5-5.

██ In O'Brien's case, we find the hearing was not required because the question did not amount to interrogation. The term "interrogation" has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements. It is necessary to consider the questioning in the context in which it is made. *Johnson v. State*, (1978) 269 Ind. 370, 380 N.E.2d 1236.

██ After forcing entry into the house, Officer Miley asked "if the owner of the residence was here." The question was directed generally to those seated in the kitchen and was informational in nature. The officer had a search warrant to serve on a resident whom he could not identify by sight. It was a necessary question under the circumstances and not a question seeking an incriminating response. That the officer did not intend to initiate a response to interrogation is further evidenced by the fact that no further questions were asked and the search proceeded routinely. The statement was properly admitted into evidence by the trial court without a hearing on voluntariness.

We therefore affirm the conviction by the trial court.

YOUNG, P. J., and MILLER, J., concur.