Colleen PRICE, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S02–9311–CR–1197.

Supreme Court of Indiana.

Nov. 1, 1993.

Fran Quigley, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Julie Zandstra Frazee, Deputy Atty. Gen., Indianapolis, for appellee.

ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

Arrested after a noisy neighborhood party, appellant Colleen Price was eventually acquitted of obstructing or interfering with the officer who took her into custody. On the other hand, she was found guilty of disorderly conduct on the basis of her statements to the officer. We grant transfer to consider an issue of first impression, the boundaries imposed on our disorderly conduct statute by the Indiana Constitution's protection for freedom of expression.

## I. Facts and Procedural History

The reticence with which police officers approach New Year's Eve is no doubt born of incidents like the one which spawned this prosecution. At about 3 a.m. on January 1, 1991, Officer Douglas Cook of the Indianapolis Police Department was patrolling the 1600 block of East Prospect Street when his attention was drawn to a boisterous knot of quarreling party-goers. This initial group included one Eddie Coleman and perhaps appellant Colleen Price, though her presence at this stage of the encounter is controverted. Officer Cook approached the group and requested that they continue their argument beyond the earshot of their neighbors, which request drew a hail of epithets from Coleman. This verbal confrontation escalated to the point that Officer Cook resolved to arrest Coleman, but Coleman managed to evade him and fled on foot.

Coleman was quickly apprehended in a nearby alley by another officer who had since happened upon the scene. Coleman remained uncooperative, and the officer had to subdue him to effect the arrest. Meanwhile, the alley began to fill with additional police officers, including Cook, and with some twenty spectators, many attracted from the party Coleman had been attending. At this juncture, Price appeared in the alley and confronted Cook regarding

the conduct of the officers. Officer Cook testified that Price was "screaming" profanities while objecting first to Coleman's arrest and then to her own. Price insists that she was neither loud nor abusive and that her protests focused on the rough treatment accorded another spectator, Ms. Brown.

After several verbal exchanges, Cook directed Price to desist and threatened her with arrest for disorderly conduct, to which she responded "F— you. I haven't done anything." Thereafter, she was arrested and subsequently charged with two counts of obstructing or interfering with a law enforcement officer by force, a Class A misdemeanor, Ind.Code Ann. § 35–44–3–3(a)(1) (West Supp.1993); public intoxication, a Class B misdemeanor, Ind.Code Ann. § 7.1–5–1–3 (West 1982); and disorderly conduct, a Class B misdemeanor, Ind. Code Ann. § 35–45–1–3(2) (West Supp. 1993). Price moved to dismiss the disorderly conduct charge, claiming that Ind.Code Ann. § 35–45–1–3(2), was unconstitutional. This motion was denied. After a bench trial, Price was acquitted on the interfering counts but convicted of disorderly conduct and public intoxication.

Price appealed, challenging the sufficiency of the evidence as to both counts and the denial of her motion to dismiss. The Court of Appeals affirmed in all respects. *Price v. State* (1992), Ind.App., 600 N.E.2d 103. Price seeks transfer, assigning denial of her motion to dismiss as error on grounds that Ind.Code Ann. § 35–45–1–3(2) is overbroad and vague in violation of the First and Fourteenth Amendments to the United States Constitution and in violation of Article I, § 9 of the Indiana Constitution. We grant transfer and reverse.

## II. *Indiana Constitutional Claim*

◼ Price has properly preserved her § 9 challenge and supports it with an excellent and incisive brief by her attorney, Fran Quigley. This Court has never reviewed the constitutionality of Ind.Code Ann. § 35–45–1–3(2)[1] nor have we had many opportunities to explicate the scope of Article I, § 9.[2] Commentators opine that our constitution's documentary record leaves few clues about the original understandings of free expression which leavened the text of § 9. The adoption of § 9 from draft language supplied by the Committee on Rights and Privileges back in 1850 was accompanied by neither debate nor amendment. The conspicuous absence of documented dissidence notwithstanding, we find ample indicia of the meaning of § 9. Interpretation of the Indiana Constitution is controlled by the text itself, illuminated by history and by the purpose and structure of our constitution and the case law surrounding it. *State Election Bd. v. Bayh* (1988), Ind., 521 N.E.2d 1313.

### A. *No Overbreadth Analysis in Our Constitution*

◼ The State stakes its fortune on the contention that Price's utterances were not within the protection of § 9:

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

It draws its line too soon, however, for § 9 expressly extends protection to speaking, writing or printing "on any subject whatever." Price was speaking; therefore the legality of her prosecution must stand or fall on the dictates of our constitution's free expression provision.

---

1. The State asserts that we upheld the constitutionality of Ind.Code Ann. § 35–45–1–3(2) in *State v. New* (1981), Ind., 421 N.E.2d 626. *Accord Communist Workers Party v. City of East Chicago*, 556 F.Supp. 47, 49 (N.D.Ind.1982). This argument fails to grasp the distinction between a challenge under § 9 of the Indiana Bill of Rights and one made under the Fourteenth Amendment to the U.S. Constitution. Only the latter was discussed in *New* and then only incidentally because those parties "[were] in agreement that the statute is constitutional." 421 N.E.2d at 628.

2. *Cf.* Randall T. Shepard, *Second Wind for the Indiana Bill of Rights*, 22 Ind.L.Rev. 575, 581 n. 39 (1989).

Price first challenges Ind.Code Ann. § 35–45–1–3(2) on the ground that it is overbroad under § 9 and therefore void "on its face." We need not dwell long on this claim either, for we find no persuasive precedent for the proposition that federal "overbreadth analysis" has taken root in the jurisprudence of the Indiana Constitution. The concept of overbreadth is apparently undergirded by the notion that expression occupies a "preferred" position within the Bill of Rights. *See Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *see generally* Edmond Cahn, *The Firstness of the First Amendment,* 65 Yale L.J. 464 (1956). The history and structure of the Indiana Constitution do not demonstrate such a status for expression. Justice Arterburn observed as much some thirty years ago when he commented that First Amendment jurisprudence differs from the Indiana approach in that "[i]t first assumes that constitutional provisions protecting property, contracts and personal liberty are not as sacred or precious as that of freedom of speech." *State v. Kuebel* (1961), 241 Ind. 268, 290, 172 N.E.2d 45, 56 (Arterburn, J., dissenting).

■ Once an Indiana constitutional challenge is properly raised, a court should focus on the actual operation of the statute at issue and refrain from speculating about hypothetical applications. *See, e.g., Hightower v. State* (1976), 168 Ind.App. 194, 343 N.E.2d 300. Unless the court concludes that the statute before it is incapable of constitutional application, it should limit itself to vindicating the rights of the party before it. These restrictions resemble those of Article III of the U.S. Constitution but are self-imposed in light of our perception of the function of the judicial department of our state government and the special aptitude of courts to decide concrete controversies between interested parties. *See In re Lawrance* (1991), Ind., 579 N.E.2d 32. We thus pass over Price's contention that Ind.Code Ann. § 35–45–1–3 is

overbroad and turn instead to whether its application in this case was constitutional.

## B. Government Power Intended to Support Individual Freedom

■ Section 9 forbids the General Assembly from passing any law "restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever." Ind. Const. art. I, § 9. A corresponding clause stipulates that "for the abuse of that right, every person shall be responsible." *Id.* Common in state constitutions, this formulation is sometimes called the "freedom-and-responsibility standard." [3] Under this standard, a legislature may not impair the flow of ideas; instead, its sole authority over expression is to sanction individuals who commit abuse. Understanding the notion of "abuse" is therefore critical to resolving cases under § 9.

■ When the import of a given word is at issue, a useful starting point is the documentary evidence which illuminates the contemporaneous understanding of its meaning. *See, e.g., Fordyce v. State* (1991), Ind.App., 569 N.E.2d 357. Dictionaries published proximate to the adoption of § 9 define abuse variously as "a thing established by usage, though contrary to good order," *Law Lexicon* 11 (J.J.S. Wharton ed. 1860); *accord* I *Bouvier's Law Dictionary* 78 (1883); "the destruction of the substance of a thing in using it," *id.;* and "[t]he ill use of any thing," John Walker, *Critical Pronouncing Dictionary* 109 (1815). These descriptions yield an acceptable working definition which we characterize as follows: Abuse is the use of a thing in a manner injurious to the order or arrangement from which it derives its function.

The free expression guarantee of the Indiana Constitution is one of thirty-seven provisions in our Bill of Rights and, we may assume, was calibrated consonant with its overall design. This design reflects the influence of the natural rights

---

**3.** Margaret A. Blanchard, *Filling in the Void: Speech and Press in State Courts prior to Gitlow, in The First Amendment Reconsidered* 14, 20

(Bill F. Chamberlin & Charlene J. Brown eds., 1982).

paradigm ascendant during Indiana's formative years. Under that theory, individuals are deemed to have ceded a quantum of their "natural" rights [4] in exchange for "receiving the advantages of mutual commerce." Sir William Blackstone, *Commentaries on the Laws of England* I:125 (Thomas M. Cooley ed. 3d ed. 1884). The aggregate of these concessions, often called the state's police power, constitutes the authority by which the advantages of political community are secured. Viewed in this light, police power is properly understood as the right of individuals, collectively, to ensure and promote the order, safety, health, morals and general welfare of the community. *Cf. Bruck v. State ex rel. Money* (1950), 228 Ind. 189, 91 N.E.2d 349.

This right of the majority to define and effect salubrious conditions is sometimes viewed as being at odds with the ability of individuals to pursue their personal ends. Our founders, however, perceived no dichotomy between individual rights and communal needs. *See* Robert C. Palmer, *Liberties as Constitutional Provisions, in Constitution and Rights in the Early American Republic* 55 (William E. Nelson & Robert C. Palmer eds., 1987); *see also State ex rel. Mavity v. Tyndall* (1947), 225 Ind. 360, 365, 74 N.E.2d 914, 916 ("It is a duty of government in so far as possible to avoid conflict [between individual rights and communal needs] and to provide a way of life and safety that will protect both rights."). Instead, they viewed the needs which gave rise to state powers as impediments to the full enjoyment of rights. State powers were thus intended to perform an ameliorative function and were considered liberty-enhancing when exercised by a properly structured republican government.

Providing this structure is the principal task for which the powers and restrictions in our Constitution and our Bill of Rights were designed. Applying these assumptions to the skeletal definition of "abuse" set out above, we conclude that § 9 derives its function from a constitutional arrangement calculated to correlate the enjoyment of individual rights and the exercise of state power such that the latter facilitates the former. Abuse then lies in that expression which injures the retained rights of individuals or undermines the State's efforts to facilitate their enjoyment. As such, § 9 limits legislative authority over expression to sanctioning encroachments upon the rights of individuals or interference with exercises of the police power. *See also Gibson v. Kincaid* (1966), 140 Ind.App. 186, 221 N.E.2d 834 (expression will be curtailed only when it infringes another's rights).

Though earnestly given, the promise that § 9 shields all expression from penalty save that which impairs a state prerogative may appear illusory, given the broad sweep of those prerogatives. The State may exercise its police power to promote the health, safety, comfort, morals, and welfare of the public. *State v. Gerhardt* (1896), 145 Ind. 439, 44 N.E. 469. In furthering these objectives, it may subject persons and property to restraints and burdens, even those which impair "natural rights." *Weisenberger v. State* (1931), 202 Ind. 424, 429, 175 N.E. 238, 240. Further, courts defer to legislative decisions about when to exercise the police power. *See Peachey v. Boswell* (1960), 240 Ind. 604, 167 N.E.2d 48, and typically require only that they be rational. From this, one

---

**4.** After some initial debate, *see generally* Monrad G. Paulsen, *"Natural Rights"—A Constitutional Doctrine in Indiana,* 25 Ind.L.J. 123 (1950), this Court determined that it would not root Indiana constitutional jurisprudence in the shifting sands of philosophical inquiry. *See Hedderich v. State* (1885), 101 Ind. 564, 1 N.E. 47. Instead, we have been inclined toward the view that "[f]undamental rights are those which have their origin in the express terms of the constitution or which are necessarily to be implied from those terms." *O'Brien v. State* (1981), Ind.App., 422 N.E.2d 1266, 1270. Nonetheless, in determining the scope of our Bill of Rights' provisions, we are not at liberty to discard the fact that the drafters of those provisions conceived of their handiwork in natural law terms. Confronted with § 1 claims, for example, we have examined text and history to determine whether a given interest is of such a quality that the founding generation would have considered it fundamental or "natural." *See, e.g., Lawrance,* 579 N.E.2d at 39.

might conclude that the Indiana Constitution permits punishing expression any time the courts are willing to indulge the presumption that the statute which penalizes it is rational.

▪ Such a conclusion fails to recognize, however, that in Indiana the police power is limited by the existence of certain preserves of human endeavor, typically denominated as interests not "within the realm of the police power," see *Milharcic v. Metropolitan Bd. of Zoning Appeals* (1986), Ind.App., 489 N.E.2d 634, 637, upon which the State must tread lightly, if at all. Put another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. *See Palmer, supra*, at 65–66. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies.[5] Accordingly, while violating a rational statute will generally constitute abuse under § 9, the State may not punish expression when doing so would impose a material burden upon a core constitutional value. We now proceed to apply this standard to Price's case.

## C. Disorderly Conduct Under § 9

For purposes of this appeal, we will assume arguendo that Ind.Code Ann. § 35–45–1–3(2) is rationally calculated to advance the public good. The commentary to § 250.2(1)(b) of the Model Penal Code, from which the statute was derived, states that it was "designed to cover the most common types of misbehavior by which individuals can create a public nuisance."[6] Model Penal Code § 250.2(1)(b) comment 4(a) (A.L.I. 1980). Those who maintain nuisances interfere with the prerogative of the state to insure that individuals are secure in the enjoyment of their rights. *See Albright v. Crim* (1933), 97 Ind.App. 388, 185 N.E. 304. Moreover, "making a great noise" and "shouting" would at common law support a nuisance action. *See, e.g., State v. Bertheol* (1843), 6 Blackf. 474, 475, 39 Am.Dec. 442; *see also* 66 C.J.S. *Nuisances* § 22 (1950). Clearly, then, abating excessive noise is an objective our legislature may legitimately pursue. This does not, however, end our inquiry.

We must also be able to conclude that Price's conviction does not materially burden a core constitutional value.[7] The

---

**5.** When the right to own property is at issue, for example, required adherence to regulations or statutes which promote order, safety, health and general welfare becomes a "taking" when it amounts to substantial interference with the owner's "use and enjoyment," *Foreman v. State ex rel. Dept. of Natural Resources* (1979), 180 Ind.App. 94, 102, 387 N.E.2d 455, 461–62, the core values protected by the right of property. *See Department of Fin. Insts. v. Holt* (1952), 231 Ind. 293, 108 N.E.2d 629.

**6.** Some portions of Ind.Code Ann. § 35–45–1–3 embody common law breach of peace provisions, *see, e.g.,* Ind.Code Ann. § 35–45–1–3(1) (engaging in fighting or tumultuous conduct), but we decline the State's invitation to characterize § 35–45–1–3(2) as a breach of the peace or "fighting words" statute. Hornbook law counts violence—either actual or threatened—as an essential element of breaching the peace. 11 C.J.S. *Breach of the Peace* §§ 2 & 3 (1938). None of Indiana's breach of the peace statutes permitted prosecution based on expression alone. *See, e.g.,* ch. 6, Rev.Stats. of 1852, § 4 (riot), § 5 (rout), § 37 (disturbing meetings), § 19 (barratry). While it was an offense in Indiana to give a verbal or oral challenge to a duel, *State v. Perkins* (1841), 6 Blackf. 20, this

was so because the challenger intended to excite the other to violence. 28 C.J.S. *Dueling* § 1 (1941) (challenges tend to provoke breaches of peace).

Section 35–45–1–3(2) is aimed at the intrusiveness and loudness of expression, not whether it is obscene or provocative. Indeed, one could violate the section by "reading the scriptures in an unreasonably loud manner," *Mesarosh v. State* (1984), Ind.App., 459 N.E.2d 426, 430 (Young, J., concurring), or "exploding firecrackers in the middle of the night." Model Penal Code § 250.2(1)(b) comment 4(a). The State thus adds nothing in this case by attaching the labels "obscene" or "fighting words" to Price's speech. Instead, if Price was truly taunting the officer (or anyone else) with "fighting words," then provocation, Ind.Code Ann. § 35–42–2–3 (West 1986), should have been charged.

**7.** Rationality inquiry under § 9 has historically centered on whether the impingement created by the statute is outweighed by the public health, welfare, and safety served. *See, e.g., Johnson v. St. Vincent Hosp.* (1980), 273 Ind. 374, 404 N.E.2d 585; *cf. Needham v. Proffitt* (1942), 220 Ind. 265, 41 N.E.2d 606 (no reason conceivable for prohibiting class of professionals from advertising prices through newspapers

State's prosecution stems from what all concede was a protest about the legality and appropriateness of police conduct. When a citizen's protest is occasioned by the conduct of government actors and regards a matter of public concern, it is squarely within the public pale. Citizen concern about the role of the police in their neighborhoods is as serious as it is timely. Therefore, while we have little regard for either Price's contumacious manner or her epithet, we conclude that her overall complaint constituted political speech.[8] As such, this case presents the question of whether § 9, or some other provision of our constitution, enshrines political expression as a core value and, if so, when enforcement of an otherwise rational anti-noise statute against it amounts to a material burden.

### D. Political Speech Under § 9

▮ What core values animate a particular guarantee is a judicial question. *See Peachey*, 240 Ind. at 611, 167 N.E.2d at 52. In deciding it we look to the purpose for which the guarantee was adopted and the history of Indiana's constitutional scheme. Our Bill of Rights does not expressly refer to political speech, and it has been argued that § 9 merely sets out the "freedom and responsibility" equation, leaving all substantive protection of expression to the limitations imposed on the police power by other provisions of our Bill of Rights.[9] We reject this view, however, for while we agree that various provisions of our Bill of Rights help limit the permissible scope of "abuse," *see, e.g.,* Ind. Const. art. I, § 3 (state may not control exercise of "religious opinions"), we also believe § 9 has substantive content: that popular comment on public concerns should not be restrained. This conclusion is supported by both the text and historical context of our free expression guarantee.

Indiana's drive towards statehood saw its territorial leadership, comprised predominately of southern planters, pitted against comparatively poor frontiersmen. The former group generally considered the "common citizen" to be "unworthy ... of presuming to criticize the conduct of officials." John D. Barnhart, *Valley of Democracy* 195 (1953). The frontiersmen agitated for greater popular participation, holding that "even the poorest had a right to a voice in the determination of the policies which affected his life as well as the career of the richest." *Id.* The frontier democrats who dominated the first Constitutional Conven-

---

and handbills while permitting broadcast advertising). "Material burden" analysis involves no such weighing nor is it influenced by the social utility of the state action at issue. Instead, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve the purpose for which it was designed, it has been materially impaired. In *Beebe v. State* (1855), 6 Ind. 501, 507–508, 63 Am.Dec. 391, for example, we explained that a statute compelling men to attend church was invalid even if, as was claimed, it advanced "the public morals, and good of families, and prevention of crime." Instead, we said, our constitution grants a "restricted legislative power, within which the legislators must limit their action for the public welfare, and whose barriers they cannot overleap under any pretext of supposed safety of the people." *Id.* We used a similar dual inquiry in *Clem v. Christole, Inc.* (1991), Ind., 582 N.E.2d 780, 784. (application of statute would "represent[ ] a considerable impairment" of "values identified in our Indiana Constitution" and therefore impermissible).

8. In *Whited v. State* (1971), 256 Ind. 386, 269 N.E.2d 149, the defendant's "tirade" against an officer was similar to the one at issue here. Writing about that case, one commentator observed that the defendant's "denunciation of the police ... would appear as deserving of protection as a denunciation of the Selective Service System, the American flag or the President of the United States." Ellen K. Thomas, Note, *Purging Unseemly Expletives from the Public Scene: A Constitutional Dilemma*, 47 Ind.L.J. 142, 154–55 (1971) (footnotes omitted). Of course, the presence of a police officer does not convert a defendant's speech into political expression, particularly in domestic or otherwise existing disputes. *See, e.g., New*, 421 N.E.2d at 626 (officer happened upon noisy dispute over ownership of property).

9. *But see State v. Robertson*, 293 Or. 402, 649 P.2d 569 (1982) (equivalent text said to embody an independent value which holds all covered speech congenial to public order). The Oregon view that speech generally cannot create abuse as between the speaker and the State is at odds with Ind. Const. art. I, § 10 (truth a defense *in prosecution for* criminal libel) and has been rejected by our Court of Appeals. *See Fordyce*, 569 N.E.2d at 362.

tion countered the risk that reactionary elements might fashion a non-majoritarian government by adopting measures to guarantee popular participation and protect scrutiny of public affairs.[10]

In 1850, when populist, anti-government Jacksonian Democrats turned their eye towards constitutional revision, the Bill of Rights captured only modest attention. To be sure, a number of important rights questions were debated and several new provisions were adopted, *see Address to the Electors of the State (Feb. 8, 1851), reprinted in* I Charles Kettleborough, *Constitution Making in Indiana* 404–05 (reprint 1971) (1968). But these innovations generally reflect completion of the agenda set in 1816 rather than departure from it.[11] This diversion of energies away from Article I likely reflected the twin facts that the 1816 version was already essentially populist in character, and that the threat to popular, republican government in Indiana had largely evaporated.

Progression in the texts of our constitutions supports this presumption. The Constitution of 1816 included a provision which reversed the common law rule that truth was no defense to a prosecution for criminal libel in cases involving "men in a public capacity" or other "matters proper for the public information."[12] The former rule was based on the notion that truthful accusations against the sovereign occasioned even greater alienation of the people's affections (the material element of seditious libel) than false ones. While the founders doubtless regarded elimination of this Orwellian rule as beneficial, old § 10 did countenance the continued viability of the rule

in non-political contexts. When the text of § 10 was revised in 1851, the idea of truth as a defense in criminal libel prosecutions was expanded while specific reference to political speech was deleted. Ind. Const. art. I, § 10.

The free expression clause underwent similar alteration. Former § 9 contained two sentences, one proscribing any law restraining the ability of individuals to "examine the proceedings of the legislature, or any branch of government," and one allowing laws holding responsible those who abuse the "invaluable right[ ] ... [to] speak, write, and print, on any subject." Ind. Const. of 1816, art. I, § 9. The 1851 revisions deleted specific reference to political speech, retaining only the proscription on laws restraining the right to speak, write and print on any subject, punishment for abuse allowing. Ind. Const. art. I, § 9.

These deletions might be said to reflect diminished regard for the importance of political expression. However, we think they demonstrate that by 1850 the importance of free interchange on public affairs was well accepted and, therefore, the need to highlight its role in the maintenance of republican government was no longer so compelling. Given this, it becomes clear that Robert Dale Owen and the other drafters of the 1851 Bill of Rights merely folded protection for political speech into the existing "freedom and responsibility" equation. Public discourse could hardly be called an abuse which impairs the sovereign when, in fact, a hale state government requires that discourse be unfettered and

---

**10.** C.A. Byers, *Growth of the Constitution of Indiana,* 6 *The Indianian* 279–80 (1890). Thus, while the delegates relied heavily on the constitutions of the Ohio Valley and southeastern states, they generally borrowed only those features which promoted political inclusion, eschewing the elitist provisions favored by territorial federalists, such as tax requirement for voting, property qualifications for officeholders, unequal apportionment of representation and protection of slavery. Barnhart, *supra,* at 193.

**11.** *See* John D. Barnhart & Donald F. Carmony, Indiana's Century Old Constitution 6, 12 (1951); Jacob P. Dunn, *The Proposed Constitution of*

*Indiana,* 7 *Indiana Magazine of History* 100, 103 (1911); *cf.* Christopher B. Coleman, *The Development of State Constitutions,* 7 *Indiana Magazine of History* 41, 45 (1911) (Constitution of 1851 motivated by legislative incompetency, and exceptionally large expenditures for internal improvements).

**12.** "In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for the public information, the truth thereof may be given in evidence." Ind. Const. of 1816, art. I, § 10.

forthcoming.[13] We thus confirm that § 9 enshrines pure [14] political speech as a core value. *See also AAFCO Heating & Air Conditioning v. Northwest Publications* (1975), 162 Ind.App. 671, 321 N.E.2d 580 (§ 9 affords special protection to speech about conduct implicating public interest), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976).

### E. Does Price's Conviction Impair a Core Value?

Because Price's conviction for noisy protest about police conduct implicates this core value, our focus now shifts to the magnitude of the impairment. To the extent that Ind.Code Ann. § 35–45–1–3(2) permits the State to impose a material burden upon the free exercise of political speech, it cannot stand. Indiana courts are reluctant, of course, to strike down statutes.

▬▬▬ Unconstitutional intention will not be attributed to the legislature if reasonably avoidable. *Conter v. Commercial Bank of Crown Point* (1936), 209 Ind. 510, 199 N.E. 567. If an act admits of two reasonable interpretations, one of which is constitutional and the other not, we choose that path which permits upholding the act. *State ex rel. Brubaker v. Pritchard* (1956), 236 Ind. 222, 138 N.E.2d 233. Therefore, we will endeavor to assign to Ind.Code Ann. § 35–45–1–3(2) a constitutional meaning if we can do so and remain faithful to legislative purpose.

The State argues that political expression may be unreasonably noisy under Ind.Code Ann. § 35–45–1–3(2) when it constitutes a "public nuisance." Whenever the state dictates the means by which political opinion may be voiced, however, it teeters on the edge of its authority. The machinery of democracy produces a sonorous cacophony, not a drone. Professor Chafee observed some seventy years ago that "you cannot limit free speech to polite criticism, because the greater a grievance the more likely men are to get excited about it." Zechariah Chafee, *Freedom of Speech in War Time*, 32 Harv.L.Rev. 932, 961 (1919) (citing Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 613–614 (7th ed. 1903)). In short, the efficacy of political speech often depends upon its ability to jar and galvanize.

Under *public* nuisance doctrine no individual interest need be injured before criminal liability may attach; it is enough that the criminalized conduct disturbs the "public order and decorum." *See* 66 C.J.S. *Nuisances* § 160; *see also* Thomas, *supra* note 8, at 150–51 & n. 50 (only potential disturbance of neighborhood, not individual, required). This is so even though no "actual breach or disturbance of the peace, or actual or threatened violence" is involved. 66 C.J.S. *Nuisances* § 160 (footnotes omitted). Moreover, whether a thing injures the public is generally a matter within the discretion of the authorities. *Smith v. City of New Albany* (1910), 175 Ind. 279, 93 N.E. 73.

▬▬▬ Subjecting the political expression of Hoosiers to this standard of gentility would impose a material burden upon this core constitutional value and would thus be impermissible. This is not to say, however, that noisy political expression may never give rise to criminal liability. Section 9 was certainly not intended to create a private warrant by which an individual might impair the fundamental rights of private persons. Our common law of torts, the mechanism by which we vindicate such pri-

**13.** *See generally* G. Alan Tarr, *State Constitutionalism and "First Amendment" Rights, in Human Rights in the States* 21 (Stanley H. Friedelbaum ed., 1988).

**14.** We use the term "pure" to emphasize that the sole issue here is the volume of defendant's expression. Charges that a defendant was fighting, obstructing traffic or otherwise engaging in disruptive conduct would require a different analysis. Moreover, an individual who directs strength, power or violence towards police officers or who makes a threatening gesture or movement in their direction, may properly be charged with violation of Ind.Code Ann. § 35–44–3–3 (resisting, obstructing or interfering with a law enforcement officer); *Spangler v. State* (1993), Ind., 607 N.E.2d 720. Here, defendant Price was charged with interfering and was acquitted.

vate encroachments, makes this clear.[15] When the expressions of one person cause harm to another in a way consistent with common law tort, an abuse under § 9 has occurred. Imposing criminal liability for behavior which harms another individual would not materially burden the values protected by § 9 given that particularized harm to more readily identifiable interests would have to be shown before liability could attach. *See generally* William L. Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997 (1966). We thus conclude that treating as abuse political speech which does not harm any particular individual ("public nuisance") does amount to a material burden, but that sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not.

 Ultimately, it was intrusion upon the interests of others which Ind.Code Ann. § 35–45–1–3(2) was designed to remedy. It seems clear that the statute's sparse language was selected by the legislature with an eye towards creating a provision which the courts could constitutionally enforce. *See* Model Penal Code § 250.2(1)(b) comments 4(b) & (c). We therefore hold that political expression becomes "unreasonably noisy" for purposes of Ind.Code Ann. § 35–45–1–3(2) when and only when it inflicts upon determinant parties harm analogous to that which would sustain tort liability against the speaker.

### F. Price's Noise

 We now turn to Price's conviction. The evidence favorable to the judgment indicates that during the early morning of January 1, 1991, in a residential area, Price repeatedly "scream[ed]" at Officer Cook. When asked about Price's volume, Cook responded that her tone was

> Very loud. Loud enough that ... I noticed that people on either side come out their back doors. We were in between

houses and there was people coming out both sides on either house out their back door to see what was going on. And she wasn't the ... [ellipsis in original] I'm saying, she wasn't the only one screaming. She was screaming this to me in my face. Record at 68.

While actual discomfort to persons of ordinary sensibilities will often be the grist of tortious conduct, there need not be proof of physical damage to individuals or property. *Cf. Friendship Farms Camps v. Parson* (1977), 172 Ind.App. 73, 359 N.E.2d 280. Instead, it is sufficient that an individual's comfortable enjoyment of his privacy is interfered with, even though not a penny's value of injury was done. *Cf. Muehlman v. Keilman* (1971), 257 Ind. 100, 272 N.E.2d 591. Moreover, noise made during normal sleeping hours may be a nuisance, while the same or even greater noise during the day would not. *Id.* at 103, 272 N.E.2d at 593. Nonetheless, the law does not deal in trifles and mere annoyance or inconvenience is not sufficient. *Wernke v. Halas* (1992), Ind.App., 600 N.E.2d 117.

 The facts in evidence here would likely be sufficient to support a finding that Price created a public nuisance. *Cf. Humphries v. State* (1991), Ind.App., 568 N.E.2d 1033 (evidence that defendant spoke in an unreasonably loud voice constitutes substantial evidence of one element of disorderly conduct). We also believe that for purposes of Ind.Code Ann. § 35–45–1–3(2), the "victims" of Price's tirade (the residents of either side of the alley) are identified with sufficient specificity. We cannot conclude, however, that the harm they suffered rose above the level of a fleeting annoyance. Moreover, given the large number of officers and civilians assembled in the alley and the commotion that had arisen even before Price's arrival, we do not think the link between her expression and any harm that was suffered was established. We therefore conclude that Price may not be punished, consistent with the

---

**15.** In 1851 our law recognized, as it does now, that expression might constitute a tort actionable by a private party, *McJunkins v. State* (1858), 10 Ind. 140, even if it was political in nature. *Prosser v. Callis* (1889), 117 Ind. 105, 19 N.E. 735 (libel action would lie against newspaper for charge that county auditor "botch[ed]" county books); *Heilman v. Shanklin* (1878), 60 Ind. 424 (libel action would lie against newspaper for charge of vote buying).

Indiana Constitution, for her particular speech on the morning of January 1st.

### III. Federal Constitutional Claim

The First Amendment's command that "Congress shall make no law ... abridging the freedom of speech" has been incorporated into the Fourteenth Amendment and as such applies to the State of Indiana. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). First Amendment analysis begins by looking at the forum the speaker seeks to employ, because "the standard by which limitations on speech must be evaluated 'differ depending on the character of the property at issue'" *Frisby v. Schultz*, 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). In this case, the State asserts that Price's speech occurred on a public street, a forum which has "immemorially been held in trust for the use of the public." *See Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (plurality).

 When a public forum is at issue, the analysis further turns on whether the challenged measure distinguishes between prohibited and permitted speech on the basis of content. *Frisby*, 487 U.S. at 481, 108 S.Ct. at 2500. A state may enforce regulations of time, manner and place which are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. On the other hand, content-based restrictions are permissible only if they are "'necessary to serve a compelling state interest,'" *Burson v. Freeman*, — U.S. —, —, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992) (plurality) (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. at 954), and narrowly drawn to achieve that end, *Perry*, 460 U.S. at 45, 103 S.Ct. at 954, or are limited to "constitutionally proscribable content," *R.A.V. v. City of St. Paul*, —

U.S. —, —, 112 S.Ct. 2538, 2543, 120 L.Ed.2d 305 (1992) (emphasis omitted).

The Court of Appeals in this case apparently assumed that § 35–45–1–3(2) imposes content-based restrictions. This view of the statute appears to have had its genesis in our decision in *Hess v. State* (1973), 260 Ind. 427, 297 N.E.2d 413, *rev'd*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303. In *Hess* this Court interpreted Indiana's 1943 disorderly conduct statute.[16] Building on our decision in *Whited v. State* (1971), 256 Ind. 386, 269 N.E.2d 149, we adopted a "categorical approach" for evaluating First Amendment challenges to § 35–27–2–1 prosecutions and concluded that Hess's speech was properly restricted because it fell within the unprotected category of fighting words. *Hess*, 260 Ind. at 429–30, 297 N.E.2d at 415. While the Supreme Court later reversed this conclusion, it left unassailed our analytical framework.

In 1976 the legislature repealed § 35–27–2–1, substituting in its place a modified version of Model Penal Code § 250.2. Act of Feb. 25, 1976, Pub.L. No. 148, § 5, 1976 Ind.Acts 750–51. We may assume that this action was, in part, prompted by criticism of the content-based approach, *see, e.g.*, Richard C. Lague, Note, *Penal Code Reform in Indiana: Piecemeal Amendment is Not the Answer*, 44 Ind.L.J. 425, 441–442 (1969), inasmuch as all such restrictions in the original statute (e.g., "offensive behavior") were deleted and similar words in the Model Penal Code draft were not adopted. The former restrictions were replaced by simple prohibition of unreasonable noise. Nonetheless, the Court of Appeals characterized the 1976 enactment as a "minor change," opining that "our courts have consistently applied the categories-of-speech analysis enunciated in *Hess*" to the new statute. We believe, however, that the absence of content definitions in our current statute invites reconsideration of this conclusion.

 The principal inquiry in determining whether a statute is content-neutral

---

**16.** Act of Mar. 10, 1943, ch. 243, § 1, 1943 Ind. Acts 685; Act of Mar. 12, 1969, ch. 161, § 1,

1969 Ind.Acts 329 (codified at Ind.Code Ann. § 35–27–2–1 (Burns Supp.1972)).

or content-based is the state's purpose for enacting it. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). A regulation that serves purposes unrelated to the content of expression is deemed neutral, "even if it has an incidental effect on some speakers or messages but not others." *Id.* In essence, "[g]overnment regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Id.* (emphasis in original). Ind.Code Ann. § 35–45–1–3(2) is certainly content-neutral upon its face. It was adopted to provide relief to people whose privacy or use and enjoyment of land has been intolerably impaired by unwelcome and unreasonable noise. It is expressly aimed at preventing the harm which flows from the volume of the expression and not its substance.

■ The statute is also narrowly tailored to further a significant state interest. The U.S. Supreme Court recently confirmed that "it can no longer be doubted that government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" *Ward*, 491 U.S. at 796, 109 S.Ct. at 2756 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). While the "well-being, tranquility and privacy of the home," *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980), are at the heart of the state's interest, *Ward*, 491 U.S. at 796, 109 S.Ct. at 2756, protection may be extended to any situation in which individuals cannot escape bombardment of their sensibilities which substantially threatens their privacy interests. *See, e.g., Eanes v. State*, 318 Md. 436, 569 A.2d 604 (1990), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665. Under such conditions, the state may even act to rid such traditional public fora as public streets and parks of excessive noise. *Ward*, 491 U.S. at 796, 109 S.Ct. at 2756. To be narrowly tailored, a statute need not employ the least restrictive or least intrusive means of accomplishing the governmental purpose. *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757. "Rather, the requirement of narrow tailoring is satisfied

'so long as the ... regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation.'" *Id.* at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Because the character of the privacy interest protected by § 35–45–1–3(2) will differ with the circumstances, only a flexible approach to volume control would be workable. We think the statute's reasonableness standard preserves this flexibility, while ensuring that no more speech is burdened than is necessary to further the state's legitimate interests.

■ Similarly, the statute's narrow focus leaves Hoosiers ample alternative means of communication. Section 35–45–1–3(2) implicates only spoken or otherwise noisy expression and has no application to written, printed or electronic media. Moreover, it proscribes only unreasonably noisy expression amounting to a public nuisance or, when political speech is at issue, amounting to a private nuisance. As the Maryland Court of Appeals has noted, the "inability to stand outside a residence or business and scream a message to the unwilling listener therein is of little consequence when there are ample alternative channels of conveying that communication." *Eanes*, 318 Md. 436, 569 A.2d at 615. In sum, we conclude that Ind.Code § 35–45–1–3(2) is content-neutral.

■ We now turn to Price's contention that § 35–45–1–3(2) is overbroad and vague and therefore facially invalid. As an initial matter, overbreadth analysis would appear to perform but a limited function when the statute at issue is a content-neutral regulation of the time, manner, or place of expression. A statute is overbroad only if it prohibits a substantial amount of protected speech. *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). By their nature, content-neutral statutes apply equally to "protected" and "unprotected" expression and, under the proper circumstances, can be applied to curtail either.

We observe simply that any application of § 35–45–1–3(2) aimed at the content of expression is impermissible. Moreover, the term "unreasonable" as informed by the Indiana Constitution does provide intelligible standards and thereby restrains the discretion of those charged with enforcing the statute. To attract sanction under the statute, expression must be unreasonably noisy under the circumstances or, when political speech is involved, amount to behavior constituting a private nuisance under traditional common law standards. Thus, even if we were to hold that Ind. Code § 35–45–1–3(2) is susceptible to an overbreadth challenge, Price's claim would fail on its merits since authoritative constructions by state courts control overbreadth analysis. *See Osborne*, 495 U.S. at 112–14, 110 S.Ct. at 1697–99.

Price's vagueness challenge also fails. The constitutional requirement of definiteness, which a vagueness challenge addresses, is violated if a criminal statute fails to give a person of ordinary intelligence fair notice that her contemplated conduct is forbidden. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The disorderly conduct statute provides fair notice. The objective "reasonableness" test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct. *See also Price v. State* (1992), Ind. App., 600 N.E.2d 103, 109 (citations to numerous opinions from other jurisdictions concluding "unreasonable noise" provisions are not unconstitutionally vague). We also note that Ind.Code Ann. § 35–45–1–3(2) is violated only after a person continues to make unreasonable noise "after being asked to stop." This warning requirement provides special protection to persons unaware that their noise level has become unreasonable.

A statute is also void for vagueness if its terms invite arbitrary or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). We have already observed that § 35–45–1–3(2)'s reasonableness standard provides a constraining and intelligible enforcement guideline for police and prosecutors, and we need not further repeat that reasoning here.

## IV. Conclusion

We reject the contention that Ind.Code § 35–45–1–3(2) is overbroad or vague in violation of the First and Fourteenth Amendments but conclude that there was insufficient evidence to establish that Price violated the statute, as interpreted to render it constitutional under the Indiana Bill of Rights. We therefore remand to the trial court for entry of an acquittal on the disorderly conduct count. The Court of Appeals correctly rejected Price's arguments with respect to her public intoxication charge, and we summarily affirm that conviction. Ind. Appellate Rule 11(B)(3).

DeBRULER and KRAHULIK, JJ., concur.

GIVAN, J., dissents with separate opinion, in which DICKSON, J., concurs.

DICKSON, J., dissents with separate opinion, in which GIVAN, J., concurs.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case. I believe the Court of Appeals opinion reported at 600 N.E.2d 103 is correct in every respect.

I do not think transfer of this case and reversal of the trial court is justified.

DICKSON, J., concurs.

DICKSON, Justice, dissenting.

The essence of the majority opinion is that a person facing arrest who protests by screaming vulgar profanities into the face of an arresting officer does not violate Indiana's disorderly conduct statute prohibiting unreasonable noise. I strenuously disagree. In an apparent desire to give vitality to Art. 1, § 9, of the Indiana Constitution independent of its federal counterpart, the majority has chosen an ill-suited case and formulated a strained rationale. Today's decision is contrary to the inten-

tions and values of those who framed and ratified our constitution.

The majority's conclusion stems from several sources: its redefinition of the word "abuse," its reliance on the concept of police power rather than the express language of our constitution to authorize penal sanctions for abusive speech, its recourse to a theory of "core constitutional value," its elevation of political speech to a preferred position, and its decision to protect loud and profane epithets as political speech.

First, it seems unnecessary and inappropriate for the majority to invent a new definition for the word "abuse" as it is used in responsibility clause of the free speech provision in our state constitution:

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: *but for the abuse of that right, every person shall be responsible.*

Constitution of Indiana, Art. 1, § 9 (emphasis added). We have long recognized as "a cardinal principle of constitutional construction that words are to be considered as used in their ordinary sense; and that their ordinary and common meaning is to be attributed to them." *Tucker v. State* (1941), 218 Ind. 614, 670, 35 N.E.2d 270, 291. The task of interpreting a particular provision of the Indiana Constitution is "a search for the common understanding of both those who framed it and *those who ratified it.*" *Bayh v. Sonneburg* (1991), Ind., 573 N.E.2d 398, 412 *cert. denied* (1992), —— U.S. ——, 112 S.Ct. 1170, 117 L.Ed.2d 415 (emphasis added); *accord Kirkpatrick v. King* (1950), 228 Ind. 236, 242–43, 91 N.E.2d 785, 788; *Bishop v. State ex rel. Griner* (1898), 149 Ind. 223, 230, 48 N.E. 1038, 1040.

In 1851, when ratifying the above-quoted language, Indiana citizens would have attributed to "abuse" its plain and ordinary meaning. In contrast, the majority today redefines "abuse" to mean "the use of a thing in a manner injurious to the order or arrangement from which it derives its function." Op. at 958. From this definition the majority then weaves its theory that the responsibility clause was intended not to apply to political speech as a "core constitutional value." The premise, however, is flawed.

In determining the probable meaning perceived by the ratifiers, we look to dictionaries of common usage contemporaneous with the ratification. *See McAnalley v. State* (1987), Ind., 514 N.E.2d 831, 834. In contrast to the majority's primary reliance upon specialty dictionaries used within the legal profession, a more reliable source for the ordinary meaning understood by the ratifiers in 1851 is the following 1856 common usage dictionary definition of the noun "abuse:"

■ Ill use; improper treatment or employment; application to a wrong purpose; as, an abuse of our natural powers; an abuse of civil rights, or of religious privileges; abuse of advantages, & c.

2. A corrupt practice or custom; as, the abuses of government.

3. Rude speech; reproachful language addressed to a person; contumely; reviling words.

4. Violation of a female.

5. Perversion of meaning; improper use or application; as, an abuse of words.

Noah Webster, *An American Dictionary of the English Language* 6 (1856). Considering the ordinary meaning of "abuse" leads to the conclusion that the framers and ratifiers did not envision a restrained responsibility clause inapplicable to "core constitutional values," but rather intended the free speech right extended in Section 9 to be limited so as to not grant protection to abusive speech. Our constitution-makers did not intend protection for rude or vile language, but instead assumed that citizens would remain civilly and criminally responsible for abuse of the right.

Second, in its focus upon the extent of the police power as a limitation upon rights conferred by our constitution, the majority opinion fails to give credence to the responsibility clause of Section 9 as a separate and independent source of governmental

authority to enact and enforce penal sanctions for abusive speech. The police power certainly may provide one basis for the government to enact laws that may partially impede constitutional rights, and the majority concerns itself with this issue. However, it overlooks that the language of Section 9 itself contains an independent, express limitation: "for the abuse of that right, every person shall be responsible." This limitation does not rely upon the extent of police power, nor should it be restricted by any overlay of police power analysis. Thus, while the majority's discussion of police power and its redefinition of "abuse" may lead it to conclude that "the State may not punish an expression when doing so would impose a material burden upon a core constitutional value," Op. at 960, this reasoning ignores that the State is additionally authorized by express language of the responsibility clause in Section 9 to provide for criminal responsibility for abuse of the free speech right.

Third, there appears to be no need for the majority to devise its "core constitutional value" analysis. The "core" of Indiana's free speech right is provided by the whole, not part, of Section 9. This is not an absolute right of completely unfettered, unlimited speech but one expressly tempered by its final clause, "for the abuse thereof, every person shall be responsible." The majority disregards this responsibility clause in fashioning its "core constitutional value" theory.

Further troubling is the inconsistency between the majority's overbreadth analysis and its subsequent limitation upon the State's authority to punish abusive speech. The majority initially rejects the concept of overbreadth, noting that the history and structure of the Indiana Constitution do not evince any "preferred" position for expression. Later, however, the majority elevates political expression to a preferred position by defining it as a "core constitutional value" entitled to particular deference, making it immune from statutes prohibiting unreasonable noise. This rationale is then used to engraft a judicial exception declaring that the disorderly conduct statute cannot apply to political speech otherwise disorderly.

Finally, the majority posits that unreasonable noise which would otherwise constitute disorderly conduct must be shielded from criminal penalty if it is an expression of "concern about the role of police." Op. at 961. The majority thus concludes that the defendant's vulgar complaints constituted political speech. The message sent by today's opinion is that persons confronted with imminent arrest may now react with unlimited noise and vulgarity—so long as such profanities include a protest about police conduct.

The Indiana citizens who wrote and ratified our constitution did not intend to create a right to curse in public, let alone at a police officer. Obscenity was not intended to be cloaked with the protection of the free speech clause. *Fordyce v. State* (1991), Ind.App., 569 N.E.2d 357, 362.

It is true that speech not constituting disorderly conduct may not be criminalized merely because it includes political protest. On the other hand, speech which does constitute disorderly conduct should not be shielded from prosecution merely because it contains such a protest.

I therefore dissent. If transfer must be granted for this Court to speak on Art. 1, § 9, I would grant transfer only to express our affirmance and adoption of the opinion of the Court of Appeals.

GIVAN, J., concurs.