**In the Matter of Jacob A. ATANGA.**

No. 49S00–9307–DI–801.

Supreme Court of Indiana.

June 30, 1994.

Jacob A. Atanga, pro se.

Donna McCoy Spear, Staff Atty., Indianapolis, for The Indiana Supreme Court Disciplinary Com'n.

## DISCIPLINARY ACTION

PER CURIAM.

The Respondent, Jacob A. Atanga, is charged in this proceeding with professional misconduct under the *Rules of Professional Responsibility*. The Disciplinary Commission of this Court asserts that Respondent violated Ind.Professional Conduct Rule 3.4(c), by knowingly disobeying an obligation of a tribunal when he failed to appear at a scheduled hearing; violated Prof.Cond.R. 8.4(d), by engaging in conduct prejudicial to the administration of justice; and violated Prof. Cond.R. 8.2(a), by making a statement with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge.

As provided under Ind.Admission and Discipline Rule 23, a Hearing Officer conducted a hearing on the above-noted charges and, now, has tendered for this Court's approval his findings of fact and conclusions. Respondent petitions this Court for review of the Hearing Officer's report. The Respondent and the Commission have submitted briefs on their respective positions.

Respondent challenges several conclusions recommended in the Hearing Officer's report and the findings of fact underlying such conclusions. This Court is not bound by the recommended facts and conclusions. Our review is *de novo* on the record. *In re Levinson* (1992), Ind., 604 N.E.2d 599; *In re Smith* (1991), Ind., 579 N.E.2d 450. Respondent's challenges to the tendered findings of fact will be considered in this process of review.

Upon consideration of the matters which are before this Court for review, we now find that Respondent immigrated to the United

States from Ghana, West Africa when he was seventeen years old; he was thirty-six years old when he completed law school and had been practicing law for two years when the events in this case occurred. Respondent is a sole practitioner. He has office space and the partial service of a receptionist in the office of another lawyer in Indianapolis.

On October 29, 1991, in Tippecanoe Superior Court 1, Kim L. Lucas was charged and pled not guilty to dealing in cocaine and for being an habitual offender; Lucas requested a public defender and the omnibus hearing was set for December 16, 1991. Respondent entered his appearance for Lucas on November 12, 1991, and filed a motion to reduce bond. This motion was set for hearing on November 14, 1991. At this hearing, Respondent learned that his client also was facing a proceeding for the revocation of probation under a 1989 conviction for robbery. The revocation hearing had been scheduled by former counsel for Lucas and Deputy Prosecuting Attorney Norris Wang for hearing on December 6, 1991. Both criminal matters were before the same judge of the Tippecanoe Superior Court, the Honorable Donald C. Johnson.

Upon being advised of existence of a proceeding for the revocation of probation, Respondent entered his appearance. At the November 14, 1991, hearing on the dealing/habitual for bond reduction, Respondent and Deputy Prosecuting Attorney Timothy Kern, by agreement, rescheduled the probation revocation hearing for December 4, 1991, at 2:30 p.m. The change was necessitated by a conflict in Respondent's schedule; he had a firm commitment to represent another individual at a hearing in Marion County.

On November 22, 1991, Respondent filed a motion in the dealing/habitual case to have his client transported to a doctor in Lafayette for medical attention. Three days later, on November 25, 1991, Wang orally moved at an *ex parte* hearing to reschedule the probation revocation proceeding back to December 6th in that the State's toxicologist witness had been previously subpoenaed for that time and was not available on December 4, 1991. The oral motion was granted and the hearing was scheduled for December 6, 1991,

at 3:00 p.m. The motion to transport Lucas was also set for this time. The clerk was directed to send a copy of the order to Respondent and to the defendant, Lucas. The judicial event was recorded in the Chronological Case Summary (CCS) for the Dealing/habitual case, but was not entered in the CCS for the probation revocation proceeding.

On December 4, 1991, Wang appeared in the probation revocation proceeding, without prior notice to Respondent, and orally moved that the revocation hearing be rescheduled to December 6th. This motion was granted and the clerk was directed to forward a copy of the order to Respondent. This judicial event was recorded in the CCS for the probation revocation proceeding. Additionally, the court reporter telephoned the receptionist in Respondent's office and informed her of the decision of the court. On December 5, 1991, Respondent filed a petition for a thirty day continuance by reason of the conflict he noted in the prior hearing. The continuance was denied and the court reporter telephoned this information to Respondent. Respondent told the court reporter that he would not appear because of the previously noted conflict. About fifteen minutes later the trial judge telephoned Respondent who again stated that he could not attend the December 6th hearing. The judge told Respondent that if he did not appear, he (the judge) would hold the Respondent in contempt.

On December 6, 1991, Respondent did not appear. Lucas declined to continue without counsel and the hearing was aborted. The trial court judge found that the Respondent was "duly notified" and entered an order for Respondent to appear at 12:00 p.m. on December 16, 1991, "to show cause why he should not be held in contempt for his failure to appear." This order was delivered to Respondent's office by certified mail on December 9, 1991. Respondent did not appear on December 16, 1991, as ordered and a writ of attachment was issued by the trial court. Again, the motion for transportation was continued at the request of Respondent's client. Respondent did have a conflicting setting in Marion County at 1:30 p.m. in a matter critical to the welfare of his client and family.

Respondent was arrested at his office on December 19, 1991, and held in the Marion County jail overnight. The next morning he was transported to Tippecanoe County where he was fingerprinted, photographed, and provided prisoner attire. Personal effects were confiscated at that time. A local attorney, at the request of others, appeared for Respondent. Respondent was advised by his attorney that if he offered an apology, "everything would be okay." Respondent's attorney also stated that the trial judge wanted Respondent's client present so she could observe the proceedings. Respondent agreed to the requests of the trial court.

The hearing was conducted in an auxiliary courtroom at the jail. The judge, deputy prosecutor, Respondent's client, the court reporter, onlookers from the prosecuting attorney's office and several reporters were present at the hearing. Respondent apologized through his attorney and promised to faithfully attend all future hearings called by the court. The court accepted the apology and purged Respondent from contempt on the condition that he pay the transportation costs. Following the contempt proceeding, while Respondent was still wearing his jail assigned clothing, the court heard the motion to transport his client for medical consultation. The court granted the motion to transport on the condition that no costs would be paid by the county. The petition to revoke probation and the omnibus hearing on the Dealing/Habitual case were rescheduled for future dates.

The following day the *Lafayette Journal & Courier* published a factual account of the contempt hearing. Several days after the article, Respondent was contacted by the volunteer editor of the *Graffiti Times,* a monthly publication of the local chapter for the American Civil Liberties Union, having a circulation between 5,000 to 10,000 in the area. An interview was conducted and the following matter appeared in the January 1992 issue of the *Graffiti Times:*

"Atanga made no effort to hide his feelings about Johnson. He said, 'I think he is ignorant, insecure, and a racist. He is motivated by political ambition.' Antanga considers that the errors and omissions in the record are part of a systematic effort to confuse the defense and to cover up the Judge's actions. He emphasizes that the situation in Johnson's court is very different from the norm. Most judges are intelligent, hard-working, fairminded men and women, he says, but in Johnson's court, the Judge is part of the prosecution. He mentioned the many functions that Deputy Prosecutor Wang performs for the Judge and the Judge's willingness to grant virtually automatic continuances for the prosecution, but none for the defense. Atanga made light of the time he spent in jail and what he considers Johnson's obvious attempt to humiliate him. Atanga says that he will not be intimidated by Johnson's 'Judicial Tyranny;' instead his 'determination to fight for the constitutional rights of my client has only been increased.'"

The article in the *Graffiti Times* accurately reflected the comments made by Respondent during his interview with the editor.

The Hearing Officer concluded that the Respondent violated the *Rules of Professional Conduct* as charged in the complaint filed in this matter. As noted above, Respondent challenges the Hearing Officer's conclusions in this regard. Respondent's contentions will be addressed under each of three alleged rule violations presented in the complaint.

■ Respondent is charged with violating Prof.Cond.R. 3.4(c) of the *Rules of Professional Conduct,* which provides that a "lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." Respondent argues that he was not aware of the hearings on December 6 and 16, 1991. Also, Respondent asserts that the conduct of the other participants, opposing counsel and the court, justifies his actions with regard to these hearings.

This Court finds that there was sufficient notice of the hearings. Respondent was aware of the December 6th hearing; he filed a motion to continue the hearing and was told by the court reporter and trial judge that the matter would be heard as scheduled. The notice for the December 16th hearing was delivered by certified mail to his office. An attorney cannot allege the lack of notice

by reason of the internal methods of communication in his office. Respondent's failure to attend the hearings was intentional.

The conduct of the other participants is troubling. The procedure employed by the Tippecanoe Superior Court in the Lucas case does not represent contemporary jurisprudence in this state. There was good reason for Respondent to view with alarm the sequence of events leading to the rescheduling of the hearing for a date known by the court to be unacceptable for defense counsel. Clearly, Respondent was forced to represent his client in a very difficult environment.

When confronted with situations of this nature, a lawyer is forced to make decisions and weigh alternatives. The primary concern, of course, must always be the faithful representation of his client. But an attorney must also understand that the administration of justice dictates that the court must ultimately have the final word on the scheduling of events in that tribunal. No matter how difficult the situation may be for the individual practitioner, the option to knowingly disobey the directive and not attend the proceeding does not belong to the attorney. Accordingly, we conclude that Respondent violated Prof.Cond.R. 3.4(c).

■ Respondent is also charged with engaging in conduct prejudicial to the administration of justice thereby violating Prof. Cond.R. 8.4(d). The failure of Respondent to attend the above-noted proceeding necessitated the rescheduling of the cases. His deliberate acts constituted a violation of this rule.

Lastly, Respondent is charged with violating Prof.Cond.R. 8.2(a) by making a statement that he knew to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge of the Tippecanoe Superior Court. During the course of the hearing of this matter, the Commission narrowed their focus of this alleged violation to the "reckless disregard" prohibition. The Commission did not attempt to demonstrate that the Respondent intentionally made a statement known to be false. As noted above, the Hearing Officer concluded that Respondent's state-

ments to the *Graffiti Times* were made with reckless disregard as to their truth or falsity.

Respondent does not raise a first amendment constitutional challenge to this charge of professional misconduct. Instead, Respondent expresses his perceptions of unfairness in his treatment in the Tippecanoe Superior Court and requests this Court to "examine the roots of this matter." Respondent further argues that at the hearing of this disciplinary matter he was precluded from introducing evidence to establish the truth of his public accusations. Respondent cites no authority on point.

As presented to this Court, the question is one of state of mind and conduct. What did Respondent know at the time he made the statements about the Tippecanoe Superior Court? Did he have a basis upon which to make statements concerning the Court? Did the statements he made challenge the qualifications or integrity of the judge? Were the statements reckless in light of his knowledge and experience?

During the course of the proceedings in this case, Respondent introduced witnesses and attempted to have them cite their opinions as to the qualifications of Judge Johnson. There was no foundation established that these witnesses presented information to the Respondent which he employed in forming conclusions before his public statements. The witnesses' testimony was properly deemed to be irrelevant by the Hearing Officer.

■ The record presented in this case indicates that Respondent had reason to complain about the trial court's administration of the Lucas case. The Tippecanoe Superior Court engaged in procedures that were unusual, at best. *Ex parte* communication between the prosecution and the court, without notice to opposing counsel of record, should not be done as matter of course. Jailing an attorney for failure to appear due to a conflict of schedule is also a questionable practice, albeit within the sound discretion of the trial court. And having an attorney appear in jail attire with his client creates a definite suggestion of partiality.

The record in this case also indicates that Respondent was informed by his counsel of a general assessment of the Judge in the local legal community. He was told that Judge Johnson was particularly stern in criminal matters. Local counsel referred to Judge Johnson as "Maximum Time."

Some of the comments made by Respondent to the *Graffiti Times* are related to the events which had occurred in the case and matters specifically known to the Respondent. Had Respondent confined his comments along these lines, there could be no finding of "reckless disregard." But Respondent went further; Respondent chose to criticize the court and Judge Johnson as an institution. Respondent stated that Judge Johnson was "ignorant, insecure, and a racist." These comments clearly draw disfavor to the integrity of the court and there is no basis upon which to conclude that the comments were anything else but reckless.

In light of the above considerations, we now conclude that by referring to Judge Johnson as "ignorant, insecure, and a racist," Respondent made a statement with reckless disregard as to its truth or falsity concerning the qualifications or integrity of the judge of the Tippecanoe Superior Court. This conduct violated Prof.Cond.R. 8.2(a).

■ It is now the duty of this Court to assess an appropriate discipline for the misconduct found in this case. The Hearing Officer recommends no particular discipline, but states that Respondent has already been adequately punished for his contempt of court. We will consider the Hearing Officer's assessment as mitigation in this matter.

Respondent's professional misconduct is directed toward the administration of justice. Courts cannot function if trial attorneys believe they have the right to deny their authority. Equally, the judicial institution is greatly impaired if attorneys choose to assault the integrity of the process and the individuals who are called upon to make decisions. This court must preserve the integrity of the process and impose discipline on those who cannot adhere to professional standards in this regard.

It is, therefore, ordered that, by reason of the professional misconduct found in this case, the Respondent, Jacob A. Atanga, should be and hereby is suspended from the practice of law for a period of thirty (30) days beginning August 1, 1994. After the completion of this period of suspension, Respondent shall be automatically reinstated to the practice of law.

Costs of this proceeding are assessed against Respondent.

SHEPARD, C.J., concurring and dissenting with opinion.

SULLIVAN, J., dissents with opinion.

SHEPARD, Chief Justice, concurring and dissenting.

I agree with the majority that Jacob Atanga's assault against Judge Johnson violated the Rules of Professional Conduct and that some penalty should be imposed. Still, I think that a suspension from the practice for thirty days is more than the facts warrant, for many of the reasons outlined by Justice Sullivan. Accordingly, I dissent from the order of suspension.

SULLIVAN, Justice, dissenting.

I respectfully dissent. The sanction imposed by the court is grossly disproportionate to the alleged misconduct.

The court suspends Mr. Atanga from the practice of law for several ill-advised decisions that he made during the course of a kafkaesque series of events. Approximately one year after being admitted to the bar, Mr. Atanga traveled to Lafayette to represent without charge an indigent, troubled young woman for whom no local representation was apparently available. After Mr. Atanga agreed to represent the woman in another matter (also without charge), the judge granted his request to schedule the next hearing so that it did not conflict with a previously scheduled court appearance in Indianapolis. The day before the Indianapolis hearing, the judge called Mr. Atanga and, countermanding his earlier entry, ordered Mr. Atanga to be in Lafayette the next day. When Mr. Atanga did not appear the next

day or at the subsequently scheduled contempt hearing, he was arrested in Indianapolis, placed in the Marion County jail overnight, transported to Lafayette the next day, fingerprinted, photographed, had his belongings confiscated, dressed in prison garb and, while so dressed, hauled into court not only to defend himself against contempt charges but also to represent his client, who had also been brought to court. At this hearing, a full complement from the local press corps was present.

The sanction imposed by the majority today is unjust for three reasons: First, it rests on insufficient findings of fact. Second, it is grossly disproportionate to the offense alleged. And, third, it fails to take into account substantial mitigating factors.

While Mr. Atanga makes legitimate arguments as to why he failed to attend either of the hearings that he is charged with missing, I agree with the hearing officer that this conduct did violate Indiana Professional Conduct Rules 3.4(c) and 8.4(d). However, I also agree with the hearing officer that the contempt sanctions imposed by the trial judge were sufficient sanction for these violations. The majority appears to agree. Therefore, the sanction at issue is that attributable to Mr. Atanga's published comments in the *Graffiti Times*. These comments were found to violate Professional Conduct Rule 8.2(a), which provides that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer

or public legal officer, or of a candidate for election or appointment to judicial or legal office." [1]

In order to sanction Mr. Atanga for a violation of Professional Conduct Rule 8.2(a), the Disciplinary Commission was required to prove each element of the alleged violation by clear and convincing evidence. Ind.Admission and Discipline Rule 23(14)(f). In its *de novo* review, the majority relies on the hearing officer's findings and conclusions to satisfy itself that this requirement was met. In my view, neither the hearing officer's findings and conclusions nor the record itself demonstrates that the Commission met its burden of proof by clear and convincing evidence.

In his findings, the hearing officer characterizes Mr. Atanga's remarks as "derogatory" and as "criticism." This is an insufficient factual basis upon which to find that Mr. Atanga's remarks were made with "reckless disregard as to [their] truth or falsity concerning the qualifications or integrity of a judge of the Tippecanoe Superior Court." Likewise, I do not believe that such an inference can be drawn from the excerpt from the *Graffiti Times* included in the findings. None of these findings establish recklessness in any way. The Commission argues that Mr. Atanga had no verification for his statements prior to making them and they were therefore reckless. But unless a finding of fact is made that Mr. Atanga had no prior verification for his statements, such an argument should not be the basis for a conclusion

1. The language used to describe the elements of the alleged offense and the Commission's burden of proof here are identical to those necessary for a public figure to maintain a cause of action for defamation. In a defamation suit brought by a public official, the First Amendment requires the plaintiff/public official to show that in publishing the defamatory statement the defendant acted with actual malice. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Actual malice is present when the defendant acts with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The actual malice element must be shown by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While these principles are most familiar in defamation actions against news media, *e.g., Indianapolis Newspapers, Inc. v. Fields* (1970), 254 Ind. 219, 259 N.E.2d 651, they apply with equal force in defamation actions against non-media defendants, *e.g., Heeb v. Smith* (1993), Ind.App., 613 N.E.2d 416. While *In re Terry* (1979), 271 Ind. 499, 394 N.E.2d 94, holds that we do not analyze charges of lawyer misconduct in the same way as charges of libel or defamation, that holding may be ripe for reexamination in light of the exalted constitutional status given "political speech" in Indiana by *Price v. State* (1993), Ind., 622 N.E.2d 954, *petition for reh'g pending.* If the obscenity Colleen Price screamed at an Indianapolis police officer constituted "popular comment on public concerns [that] should not be restrained," *Id.* at 961, so too for Mr. Atanga's comments here.

of recklessness and should not be the basis for discipline. I also note that the hearing officer makes no finding or conclusion that the Commission has proved the charges against Mr. Atanga by clear and convincing evidence. While adherence to this standard may probably be assumed, it would be better practice to have it specifically set forth.

In analyzing the appropriate sanction for lawyer misconduct, this court relies heavily upon the American Bar Association Standards for Imposing Lawyer Sanctions ("Standards"). *E.g., In re Burchett* (1994), Ind., 630 N.E.2d 205; *In re Hanley* (1994), Ind., 627 N.E.2d 800; *In re Pitschke* (1994), Ind., 627 N.E.2d 440. While by no means dispositive, the Standards provide a good measure of the proportionality of any particular sanction to the alleged misconduct. Standard 7.0 is applicable to the alleged misconduct in this case. That Standard provides as follows:

7.0 Violations of Other Duties Owed as Professional

7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

7.4 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.

Standards for Employing Lawyer Sanctions § 7.0 (American Bar Association, 1992).

Assuming Mr. Atanga did violate Professional Conduct Rule 8.2(a), that violation was clearly no more than an isolated instance that caused little or no actual or potential injury. The statements made by Mr. Atanga that are the subject of this proceeding appear at the very end of a long story covering parts of three pages in an obscure newsletter. For these statements of Mr. Atanga even to be read, an individual would first have to secure a copy of the *Graffiti Times* and read through 81 column inches of text, making two page jumps along the way, before getting to Mr. Atanga's comments. Publication of these statements in such an obscure place cannot possibly cause injury. Publication of the majority's opinion will, in all likelihood, get far more attention.

This court has repeatedly held that in disciplinary cases it is appropriate to consider factors in mitigation. *In re Reed* (1992), Ind., 599 N.E.2d 601; *In re Roche* (1989), Ind., 540 N.E.2d 36. Yet despite the presence of significant mitigating factors in this case, the majority ignores them altogether. A mitigating factor of some weight is the indignity to which Mr. Atanga was subjected in being required to represent his client in court while wearing prison garb. *Cf. In re Turner* (1994), Ind., 631 N.E.2d 918, 920 (Shepard, C.J., dissenting). It is of greater weight that Mr. Atanga was respectful and deferential to the court in every way throughout the contempt proceeding and that he made no comments whatsoever to the news media which had been rounded up to cover the event. His comments came only some time later, after they had been solicited by the editor of an extraordinarily obscure newsletter. It should also not be left out of the balance that Mr. Atanga is a relatively new lawyer, *In re Burton* (1993), Ind., 625 N.E.2d 457, *In re Matz* (1990), Ind., 560 N.E.2d 66, and that he has, moreover, no prior record of disciplinary action. *In re Schreiber* (1994), Ind., 632 N.E.2d 362.

Entitled to much greater weight still is Mr. Atanga's considerable record of service to both bar and community. *In re Lebamoff* (1994), Ind., 630 N.E.2d 560. In the very best tradition of our profession, Mr. Atanga devotes considerable time and effort to the

representation of indigent clients. Indeed, it was his highly commendable response to a request to represent an indigent, troubled young woman in Lafayette that gave rise to the unfortunate events in this case. Corollary to this is the fact that suspending Mr. Atanga from the practice of law for any period of time will deprive many Hoosiers who are financially unable to secure counsel of the benefit of Mr. Atanga's representation. Furthermore, Mr. Atanga has been actively involved in service to the bar and currently serves as the president-elect of the Marion County Bar Association, an organization that makes a significant contribution to the legal profession not just in Indianapolis, but throughout the state.

Because the sanction imposed by the majority is not supported by sufficient evidence of misconduct, because it is disproportionate to the alleged misconduct, and because it fails to take into account significant mitigating factors, I dissent.