**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 21 2014, 10:15 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK LEEMAN**
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

RONNIE JACKSON,                               )
                                              )
    Appellant-Defendant,                     )
                                              )
      vs.                                  )    No. 09A02-1401-CR-31
                                              )
STATE OF INDIANA,                             )
                                              )
    Appellee-Plaintiff.                      )

APPEAL FROM THE CASS SUPERIOR COURT
The Honorable Richard A. Maughmer, Judge
Cause No. 09D02-1207-FB-32

**October 21, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Ronnie Jackson appeals his conviction of dealing in cocaine as a class B felony. Jackson raises three issues which we revise and restate as:

I.      Whether the trial court abused its discretion when it admitted certain recordings into evidence;

II.     Whether the prosecutor committed misconduct during closing argument which resulted in fundamental error; and

III.    Whether the evidence is sufficient to sustain Jackson's conviction.

We affirm.

FACTS AND PROCEDURAL HISTORY

At some point prior to May 6, 2012, Logansport Police Sergeant Brandon Bonnell, who was assigned to the Cass County Drug Task Force, arrested Debra Metz on warrants for dealing in methamphetamine and spoke with her about working with the Drug Task Force, but did not make any promises regarding the resolution of her case. On May 6, 2012, Metz called Jackson to set up a deal for crack cocaine and arranged to meet him. Metz then contacted Sergeant Bonnell and said that she had been in communication with Jackson earlier in the day and he had some cocaine that he would sell for $200. Sergeant Bonnell met with Metz at the Cass County Emergency Management Building and went over the discussion Metz had with Jackson.

Logansport Police Detective John Rogers, a member of the Drug Task Force, performed an "outer clothing pat" of Metz who was wearing a t-shirt, blue jean shorts, and flip flops. Transcript at 46. Detective Rogers asked Metz to open her pockets and remove anything in them. He placed his finger in the coin pocket of her shorts and opened her purse and cigarette pack. He also searched the pickup truck Metz was

2

driving.  Specifically, he looked in the glove box, above the visors, under the seats, in the ashtray, under the dashboard, in the bed of the truck, and "anywhere that is immediate in her, you know, inside the vehicle."  Id. at 166.  He did not see any loose paneling or rips or holes in the upholstery where something could be hidden.

Metz was then given $200 in buy money and a device resembling a key fob which records audio and video.  Detective Rogers left and parked about fifty feet away from Jackson's residence where he could watch the buy.  Metz later departed in her vehicle with Sergeant Bonnell following her in his vehicle, and Sergeant Bonnell kept constant surveillance until Metz arrived at Jackson's residence a few minutes later.

Shortly after Metz parked her truck around 4:00 p.m., Jackson exited his house, approached Metz's truck, and entered it through the passenger door.  The two engaged in a brief conversation, Jackson gave Metz crack cocaine, and Metz gave him the money.  After less than two minutes, Jackson exited the truck.  Metz then drove away, and Sergeant Bonnell followed her and maintained constant surveillance until she arrived back at the location where they had initially met.  Metz did not make any stops while on the way to that location.  She exited the truck, and Sergeant Bonnell entered the truck and located two small knotted plastic bags containing an off-white rock substance.  The police searched Metz and found no contraband on her person and did not find the buy money.

A short time later, Jackson called Metz and told her that he did not give her all the drugs that she had paid for and to return to obtain the rest of the drugs.  Metz said that she would be right back.  The police searched Metz again and found no contraband.

3

Detective Rogers left before Metz and Sergeant Bonnell and set up a position where he was able to view Jackson's house. Sergeant Bonnell equipped Metz again with the recording device, and Metz drove her truck to Jackson's residence. Sergeant Bonnell followed Metz and maintained constant surveillance, and Metz made no stops until she arrived at Jackson's residence.

When she arrived, Jackson approached her vehicle from the driver's side and conversed with her through the driver's window. Jackson asked Metz if she was wearing a wire, and Metz said no. Jackson gave her two bags of crack cocaine. Detective Rogers used a video camera to record the meeting. Metz left, and Sergeant Bonnell followed her and maintained constant surveillance without Metz stopping until she returned to the initial location which took less than five minutes. Sergeant Bonnell located two more plastic knotted bags with the corner cut off and containing an off-white rock substance. Sergeant Bonnell showed Metz a picture of Jackson and asked her if that was who she just did the buy with, and Metz said yes.

On July 18, 2012, the State charged Jackson with dealing in cocaine as a class B felony. On November 20 and 21, 2013, the court held a jury trial, during which Sergeant Bonnell and Metz identified State's Exhibit 2 as a DVD containing video and audio from the device that resembled a key fob of the interaction between Metz and Jackson on May 6, 2012. The prosecutor moved to admit State's Exhibit 2, and Jackson objected on the basis that "it really doesn't show anything" and was inadmissible under Rules 402 and 403. Id. at 94. The court initially indicated that it would admit State's Exhibit 2 over Jackson's objection. The prosecutor began playing State's Exhibit 2 for the jury, and the

4

court at some point admonished the jury and the jury then left the courtroom.[1]  The court

then stated:

> After the court having examined half of State's exhibit 2 in front of the jury
> I am really concerned that the probative value of this exhibit is far
> outweighed by its prejudicial effect.  It appears to me to be nothing that is
> intelligible, completely self-serving.  All I'm – let me make sure that I
> understand this correctly.  I saw a buy being set up.  I saw a police officer
> with a picture and saying who was going to be the intended target.  I didn't
> see – I would have loved to have seen the defendant's face when the
> transaction took place or the drugs being traded.  I didn't even understand
> anything, [prosecutor], that occurred when the transaction occurred except
> the word f---.  Okay?  Was there anything else that is legible?

Id. at 98.  The court stated that "it is starting to violate my puke test especially when

Officer Bonnell sets things up at the beginning and the end that this is nothing that isn't

covered by witness's testimony from the witness stand."  Id.  After some discussion and

the court's viewing of the entire exhibit, the court indicated that it would admit the forty-

four second portion of State's Exhibit 2 from the time of 15:15:16 to 15:16:00 and the

seventy second portion from 15:31:45 to 15:32:55.  Jackson's counsel objected on the

basis that "there is almost no relevance, 402."  Id. at 106.

> The jury was brought back into the courtroom, and the court stated:
>
> I am now – the defense has objected to State's exhibit 2 and I find that their
> reasons for their objection and an [sic] additional things that we have
> discussed on the record outside of your presence to be appropriate and I am
> now sustaining the objection.  Not allowing State's exhibit 2 into evidence
> at least to a portion of that exhibit that you saw up to this point in time.
> Okay?  So I am directing you not to consider any of the video that you have
> seen up to this point in time.  I want to see a head nod, yeah, Judge, I
> understand.  We are not going to talk about that.  That is not in evidence.
> What I have done and I'm going to allow to happen at this time is that we
> are going to take two specific portions of State's 2 and I'm allowing the

---

[1] The transcript merely states: "[THE JURY ADMONISHED AND LEAVES COURTROOM]."
Transcript at 98.

> State to play that into the record for your observation subject to Defendant's objection again but I've decided that I am going to allow this portion in.

Id. at 108. The two portions of State's Exhibit 2 specified by the court were then played for the jury.

Metz testified that she was the female in the video and Jackson was the male in the conversation. Metz testified that Jackson said "those all right" in the first portion of the video and that he was asking whether the crack looked all right. Id. at 110. Metz testified that in the second portion of the video she said "thanks for being so honest" because Jackson had called back to say he did not give her enough crack. Id. at 111. She testified that Jackson asked: "[A]re you wearing a wire?" Id. Metz testified that she had some trouble in the past and had a case pending for meth that had not been resolved and that she had not been offered any plea agreements. She also admitted to having a prior conviction for conversion.

Detective Rogers testified regarding the extent of his search of Metz and her pickup truck and acknowledged that he did not search Metz's private areas. During cross-examination, he indicated that he did not remove the ashtray from the truck. He testified that State's Exhibit 8 consisted of a DVD of video that he recorded of the second transaction. Jackson's counsel objected to the admission of State's Exhibit 8 on the basis that "[i]t's garbled, it contains video and audio" and "[t]he audio is subject to speculation and invites the jury to speculate." Id. at 174. The court allowed the admission of State's Exhibit 8 over the objection of defense counsel. During cross-examination, Jackson's counsel asked: "So you have a list of people that you are after?" Id. at 182. Detective

6

Rogers answered: "I have more people than I can keep up with to be quite honest with you. I have two people doing five people's jobs. It is a problem in our community." Id. After the State rested, Jackson's counsel moved for a directed verdict or acquittal and argued that the audio and video invited rampant speculation by the jury. The court denied the motion.

During closing argument, the prosecutor stated:

[Jackson] gets in the car the first time for forty-four seconds which you all heard on that audio recording. He says something to the effect of 'are we all good'? And I ask you to think about that. Again use your common sense and your life experiences. 'Are we all good'? What does that mean? I even asked [Metz] what does that mean to you? Did I get enough crack cocaine for the money that I provided him.

Id. at 204.

During closing argument, Jackson's counsel stated:

You know, I saw the tape and listened to the video or the audio and the pictures and it always mystified me that in a country where we can send a Volkswagen-sized robot to Mars that does all sorts of fancy things including sending back pretty pictures, we can send astronauts to the moon and they can talk to us and we can send probes to distant planets and take beautiful color pictures of them why in the world we can't get a transmitter and a video camera that works for a half a block and across the street. . . . What I heard was a conversation about a truck and a car. I didn't hear the word cocaine, crack cocaine, cocaine base, anything. I heard a conversation – what little I got out of it about a truck and a car. I didn't see any pictures of anything change hands between anybody. I didn't see any money. I didn't say [sic] any baggies. I didn't see any of that. It's not there. I heard a garbled conversation is what I heard. And I saw a video taken by Officer Rogers that shows that my client and [Metz] had a short conversation where he is leaning into her truck. I can't count the number of times I've gone out in front of my house, leaned in somebody's vehicle and talked to them for a short amount of time and I'm not a drug dealer. So what the State proved is that they had a short conversation – a couple short conversations and that's it.

Id. at 208-209.

7

During rebuttal argument, the prosecutor stated:

Now I told you at the beginning that my best witness was members of the jury because what you were going to be able to see and what you are going to be able to hear. And I'm going to take that back. I made a mistake. My best witness is Ronnie Jackson's voice. The voice that was identified by Brandon Bonnell and by [Metz] as being the voice that's on that recording. [Defense counsel] is right we did hear a little talk about the car, something about the truck. I heard that. But you know what else I heard? Seven words that make the whole difference in this case, 'you sure you ain't wearing a wire'? I heard that as clear as day as I know all of you did. I watched all of you paying attention to that. He said it three times. The second time she went back there. 'I should make you take your clothes off to make sure your [sic] are not wearing a wire. Ha, ha, ha, ha. Don't "f" me around. Are you sure you are not wearing a wire? You ain't sure you are not wearing a wire'? Now who asks that? Who asks somebody if they are wearing a wire? Drug dealers.

\* \* \* \* \*

As I mentioned before he asked 'those all right' we listened to that. And I asked [Metz] what happened at that exact moment when we heard the words 'those all right'. She said he handed me two bags of crack cocaine, I handed him the money. I said what did you take that to mean, 'those all right'? That I was getting my money's worth, two hundred dollars for my two little bags of cocaine because he wanted to make sure because apparently he is an honest drug dealer. He wanted his customer to be happy. Those all right oh wait a minute I didn't give you enough for your money come back. Because I want you to be a repeat customer, I want you to come back and buy more cocaine from me later. If I short you maybe you will go somewhere else.

Id. at 216-217. The prosecutor also stated:

Take you [sic] common sense and your life experience back there. What do you think would happen if [Metz] pulled the keys out and this little thing on there is probably smaller than my pen and goes 'Can I have some crack cocaine, please, please?' he is going to know she is a confidential informant. Smile into the camera real big. She is in a highly dangerous situation dealing with dangerous people in the drug trade.

Id. at 219.

8

The jury found Jackson guilty as charged. On December 17, 2013, the court sentenced Jackson to fifteen years in the Department of Correction.

DISCUSSION

I.

The first issue is whether the trial court abused its discretion when it admitted the recordings in State's Exhibits 2 and 8. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. Fox v. State, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), reh'g denied, trans. denied.

Jackson argues that the audio and video quality of State's Exhibits 2 and 8 was so unintelligible as to render the recording unduly prejudicial and confusing under Evidence Rule 403. He argues that the audio on State's Exhibits 2 and 8 was so jumbled that the jury was left to speculate as to the content of the recordings. He contends that the admission was not harmless error because Metz was not a credible witness and the police did only a cursory search of her before the drug buy and let easily accessible hiding areas in her car go unsearched. He also points to the prosecutor's statements during closing argument regarding what could be heard on the recordings and contends that the jury was given little choice but to believe the prosecutor's interpretation of the garbled audio

9

during his closing statements. Jackson also argues that the recordings contained inadmissible hearsay statements from Metz, that these statements were essential to establishing Metz's credibility and what transpired during her interaction with Jackson, and that their use at trial was so prejudicial that a fair verdict was not possible.

The State contends that State's Exhibit 2 contained high-quality audio recordings of the transactions and that the relevant portions include Jackson asking "[t]hose all right" during the first transaction, which Metz explained occurred when Jackson handed her the cocaine to inquire whether she thought the portions were large enough. Appellee's Brief at 7 (quoting State's Exhibit 2 at 15:15:45). The State asserts that the exhibit reveals that Jackson stated during the second transaction: "If I had time I would make you strip to see if you had a wire on," "don't f--- me around," and "you gonna get high with your mom?" Id. at 7 (quoting State's Exhibit 2 at 15:31:45-15:31:49; 15:32:04). It asserts that Jackson said "don't f--- me around" in State's Exhibit 8 and that the audio is the same conversation which was recorded with greater clarity in State's Exhibit 2. The State also contends that any error in the admission of the recordings was harmless, and that Jackson has waived any claim that Metz's statements on the recordings are inadmissible hearsay because he did not object on this basis at trial and he has not shown error, much less fundamental error.

To the extent Jackson argues that the recordings contained inadmissible hearsay statements from Metz, he does not point to any particular statement in the recordings or to any particular point or time period in them, nor does he develop this argument. Consequently, this argument is waived. See, e.g., Cooper v. State, 854 N.E.2d 831, 834

10

n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.").

With respect to Jackson's argument that State's Exhibits 2 and 8 were inadmissible, we observe that Jackson objected on the basis of Evidence Rules 402 and 403. At the time of trial, Ind. Evidence Rule 402 provided that "[a]ll relevant evidence is admissible, except as otherwise provided by the United States or Indiana constitutions, by statute not in conflict with these rules, by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible."[2] Ind. Evidence Rule 403 provided that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[3]

The foundational requirements for the admission of a tape recording made in a non-custodial setting are: (1) that the recording is authentic and correct; (2) that it does not contain evidence otherwise inadmissible; and (3) that it be of such clarity as to be intelligible and enlightening to the jury. Kidd v. State, 738 N.E.2d 1039, 1042 (Ind.

---

[2] Subsequently amended effective January 1, 2014.

[3] Subsequently amended effective January 1, 2014.

11

2000) (citing <u>McCollum v. State</u>, 582 N.E.2d 804, 811-812 (Ind. 1991), <u>reh'g</u> <u>denied</u>), <u>reh'g</u> <u>denied</u>. The trial court has wide discretion in determining whether these criteria have been met. <u>Id.</u> The standard of quality expected of a recording in an interrogation room cannot be used to judge a recording of a person wearing a wire transmitter. <u>Id.</u> (citing <u>Fassoth v. State</u>, 525 N.E.2d 318 (Ind. 1988)). Taken as a whole, the tape must be of such clarity that it does not lead to jury speculation as to its contents. <u>Sharp v. State</u>, 534 N.E.2d 708, 712 (Ind. 1989), <u>reh'g</u> <u>denied</u>, <u>cert.</u> <u>denied</u>, 494 U.S. 1031, 110 S. Ct. 1481 (1990).

We observe that a portion of State's Exhibit 2 was played for the jury before being stopped at some point by the trial court, and then only two portions of the exhibit were admitted. Only after listening multiple times to the first portion of State's Exhibit 2 that was admitted, were we able to discern that the male voice appears to say: "Those all right." State's Exhibit 2 at 15:15:43-15:15-46. With respect to State's Exhibit 8, Detective Rogers testified that he was monitoring the audio transmitter and that "[t]he further you get away obviously it gets distorted, static, different things affect it for whatever reason. I mean it's wireless so it's transmitting from what we provide to the informant to us and the connection is not just very good for whatever reason." Transcript at 172. While we were able to discern some words, the quality of State's Exhibits 2 and 8 is, on balance, poor enough to negate the probative value of the exhibits. We believe that the jury was left to speculate as to the contents of these exhibits. Accordingly, we conclude that the trial court abused its discretion in admitting State's Exhibits 2 and 8.

12

Nonetheless, we also conclude that any error was harmless. Metz testified that Jackson gave her drugs and she gave him money. She also testified that Jackson asked her if she was wearing a wire and asked her "[t]hose all right," which occurred when Jackson was handing her the crack cocaine. Id. at 110. Detective Rogers testified regarding the extent of his search of Metz and her truck. During cross-examination, he testified that he searched Metz's truck for probably ten minutes and that he attempts to perform a "pretty thorough search." Id. at 178. Detective Rogers testified that he was about fifty feet away from Jackson's residence, that he observed Metz arrive at the location, park, and Jackson enter the passenger side of Metz's truck. He also testified that, based upon his training and experience, a drug transaction took place between Metz and Jackson. Sergeant Bonnell followed Metz in his vehicle from their initial location and kept constant surveillance until Metz arrived at Jackson's residence a few minutes later. After the transaction, Sergeant Bonnell followed Metz and maintained constant surveillance until she arrived back at the location where they initially met. After meeting at the initial location, Sergeant Bonnell located two small knotted plastic bags containing crack cocaine and did not find the buy money. A short time later, Jackson called Metz and told her that he did not give her all the drugs that she had paid for and to return to obtain the rest of the drugs. The police searched Metz again and found no contraband. Metz again drove to Jackson's residence without making any stops, and Sergeant Bonnell maintained constant surveillance. After the second transaction, Sergeant Bonnell located two more plastic knotted bags containing crack cocaine. Based upon the substantial independent evidence of guilt, even assuming that the trial court erred in admitting

13

State's Exhibits 2 and 8, any such error was harmless. See Fassoth, 525 N.E.2d at 324 (holding that the content of the tape-recorded conversation was merely cumulative of a witness's testimony about the drug transaction and there was no reversible error in the admission of the recording).

## II.

The next issue is whether the prosecutor committed misconduct during closing argument which resulted in fundamental error. Jackson argues that the prosecutor's statement that Jackson was a drug dealer trying to establish a repeat customer was improper and placed Jackson in grave peril. He contends that the prosecutor's claim that Jackson wanted Metz "to be happy" so he could gain a "repeat customer" improperly suggested that he repeatedly and regularly dealt in drugs. Appellant's Brief at 14 (quoting Transcript at 217). He asserts that there was no admissible evidence showing that he was a regular and repeat drug dealer, and that the impropriety of the prosecutor's statements was further exacerbated by his unsubstantiated claim that "crack cocaine is a problem here in our community and it is something that the Drug Task Force utilizes whatever resources that they have available to them in an effort to stamp it out and to get rid of . . . ." Id. (quoting Transcript at 207). Jackson also argues that the prosecutor's misconduct constituted fundamental error. The State argues that the prosecutor committed no misconduct much less conduct amounting to fundamental error.

In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave

14

peril to which he should not have been subjected. <u>Cooper</u>, 854 N.E.2d at 835. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. <u>Id.</u> The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. <u>Id.</u> When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. <u>Id.</u> If the party is not satisfied with the admonishment, then he should move for mistrial. <u>Id.</u> Failure to request an admonishment or to move for mistrial results in waiver. <u>Id.</u>

Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. <u>Id.</u> More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. <u>Id.</u> Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. <u>Id.</u> It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." <u>Id.</u>

"It is proper for a prosecutor to argue both law and fact during final argument and propound conclusions based upon his analysis of the evidence." <u>Poling v. State</u>, 938 N.E.2d 1212, 1217 (Ind. Ct. App. 2010). "A prosecutor, in final arguments, can 'state and discuss the evidence and reasonable inferences derivable therefrom so long as there is no implication of personal knowledge that is independent of the evidence.'" <u>Hobson v.</u>

<u>State</u>, 675 N.E.2d 1090, 1096 (Ind. 1996) (quoting <u>Kappos v. State</u>, 577 N.E.2d 974, 977 (Ind. Ct. App. 1991), <u>trans.</u> <u>denied</u>).

> Jackson appears to focus on the following arguments by the prosecutor:
>
> And I asked [Metz] what happened at that exact moment when we heard the words 'those all right'. She said he handed me two bags of crack cocaine, I handed him the money. I said what did you take that to mean, 'those all right'? That I was getting my money's worth, two hundred dollars for my two little bags of cocaine because he wanted to make sure because apparently he is an honest drug dealer. He wanted his customer to be happy. Those all right oh wait a minute I didn't give you enough for your money come back. Because I want you to be a repeat customer, I want you to come back and buy more cocaine from me later. If I short you maybe you will go somewhere else.

Transcript at 217.

While Jackson argues that there was no admissible evidence showing that he was a regular and repeat drug dealer or that he wanted to make his customer happy, the testimony was that Jackson sold Metz crack cocaine, and called her a short time later to tell her that he did not give her all the drugs she had paid for and to come back to obtain the rest of the drugs. Metz returned to Jackson's residence, and Jackson then gave Metz two more bags of crack cocaine. With respect to Jackson's argument that the prosecutor made the unsubstantiated claim that crack cocaine was a problem in the community and the Drug Task Force uses whatever resources they have available, we observe that Detective Rogers testified on cross-examination: "I have more people than I can keep up with to be quite honest with you. I have two people doing five people's jobs. It is a problem in our community." <u>Id.</u> at 182. Based upon the record, we cannot say that fundamental error occurred.

The next issue is whether the evidence is sufficient to sustain Jackson's conviction. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

Jackson's sole argument is that there was no in-court identification establishing that he was the person identified by the State's witnesses. He argues that on three occasions witnesses were asked to identify for the jurors whether Ronnie Jackson was in the courtroom. Jackson argues that "[a]lthough three witnesses purportedly described Jackson, the record fails to show that the witnesses were actually identifying the defendant." Appellant's Brief at 16. He asserts that more than one person could have been sitting at defense counsel table and that it was not established beyond a reasonable doubt that the witnesses were actually identifying him rather than someone else sitting at defense counsel's table. The State argues that Metz and both officers who observed the transaction identified Jackson and that his argument amounts to an invitation to reweigh the evidence.

Sergeant Bonnell testified that he saw Jackson sitting in the courtroom and when asked to identify him for the record, he answered: "Brown sweater, yellow polo shirt underneath, gray khakis sitting to your right at the defense table." Transcript at 41. He

also testified that Jackson was a targeted individual, that Metz arrived at Jackson's residence, and that Jackson exited his house and approached her vehicle. Metz testified that she conducted a drug transaction with Jackson, that she saw Jackson sitting in the courtroom, and, when asked to point him out and describe something that he was wearing, she stated: "He is over there in a sweater." Id. at 82. When asked what color was his sweater, she testified that it was brown. When the prosecutor asked Metz who was the male in the conversation in State's Exhibit 2, she answered Ronnie and when the prosecutor asked, "[t]he defendant sitting here at the table," she answered "Yes." Id. at 110. Detective Rogers testified that the individual depicted in State's Exhibit 8 was Jackson and that Jackson was sitting in the courtroom and was "wearing a shirt and a tie sitting next to Mr. Boonstra at the defense table." Id. at 175. He also testified that he observed Metz arrive at the location and Jackson enter the passenger side of Metz's truck, and that, based upon his training and experience, a drug transaction occurred.

It is sufficient to identify a defendant at trial by name. O'Brien v. State, 422 N.E.2d 1266, 1271 (Ind. Ct. App. 1981). The witnesses identified Jackson by name. Further, defense counsel acknowledged that Jackson was leaning into Metz's truck. Specifically, defense counsel stated: "And I saw a video taken by Officer Rogers that shows that my client and [Metz] had a short conversation where he is leaning into her truck." Transcript at 209. We conclude that the State presented evidence of probative value from which a reasonable jury could have found that Jackson was guilty of dealing in cocaine as a class B felony.

## CONCLUSION

For the foregoing reasons, we affirm Jackson's conviction for dealing in cocaine as a class B felony.

Affirmed.

BARNES, J., and BRADFORD, J., concur.