

FILED

Nov 29 2017, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Justin B. Mills
Mills Law Office
Marengo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Alan Ruiz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 29, 2017

Court of Appeals Case No.
10A05-1702-CR-311

Appeal from the Clark Circuit
Court

The Honorable Joseph P. Weber,
Judge

Trial Court Cause No.
10C03-1605-CM-1130

**Pyle, Judge.**

## Statement of the Case

Alan Ruiz ("Ruiz") appeals his conviction, following a bench trial, for Class B misdemeanor public intoxication.[1] Ruiz argues that there was insufficient evidence to support his conviction. Because the evidence and reasonable inferences show that Ruiz was intoxicated in a public place and in imminent danger of breaching the peace, we affirm his conviction.

We affirm.[2]

## Issue

Whether sufficient evidence supports Ruiz's conviction.

## Facts

The facts most favorable to the judgment reveal that, during the morning hours of May 6, 2016, Ruiz and some friends, who all lived in the King Solomon apartments ("the apartments") in Clark County, were drinking alcohol while sitting at some picnic tables at a Rally's restaurant that was adjacent to the apartments. That day, within a two-hour window of time, officers from the

---

[1] IND. CODE § 7.1-5-1-3.

[2] We note that the "Judgment of Conviction and Sentence" order, dated January 9, 2017, contained in Ruiz's Appellant's Appendix suggests that Ruiz pled guilty to Class B misdemeanor public intoxication pursuant to a plea agreement. (App. Vol. 2 at 8). However, the transcript of the January 9, 2017 bench trial and the chronological case summary entry for January 9 confirm that Ruiz was found guilty of the charge after a bench trial. We remand to the trial court to correct its written order to correctly reflect that judgment of conviction was entered pursuant to a guilty verdict following a bench trial.

Jefferson Police Department were dispatched to the apartments on three separate occasions for complaints regarding Ruiz.

[4] The first dispatch occurred at 1:17 p.m. and the complaint was that the "subject was yelling racial slurs at the caller" and "drinking vodka in the grass area at Rally's." (Tr. Vol. 2 at 31). The responding officers told Ruiz that he was "not allowed to be outside" and instructed him to go to and remain in his apartment. (Tr. Vol. 2 at 27).

[5] The second dispatch call occurred, twenty-two minutes later, at 1:39 p.m. The complaint for this second call was that an "intoxicated subject" was in the hallway "causing a disturbance[.]" (Tr. Vol. 2 at 31). The responding officers "advised [Ruiz] to stay in his apartment" and warned him that "if they received another call that he would be incarcerated." (Tr. Vol. 2 at 31).

[6] The third dispatch call occurred two hours later, at approximately 3:40 p.m., and this dispatch call was based on a complaint that an "intoxicated male subject" had been "creating a disturbance with some residents nearby there." (Tr. Vol. 2 at 9). Officer Alyssa Wright ("Officer Wright"), who responded to the call, was aware that this was the third dispatch to the apartment complex for complaints about Ruiz. Officer Wright had been given a specific description of the suspect and was informed that he was walking in a grassy area near the apartments and the Rally's restaurant.

[7] When Officer Wright arrived at the scene, she saw Ruiz walking in the grass near the Rally's and noticed that he was "swaying back and forth" and having

"a lot of trouble keeping his balance." (Tr. Vol. 2 at 10). A few of the apartment residents, who were approximately two hundred feet away from Ruiz, pointed toward Ruiz and yelled to inform the officer that "that was the guy[,]" who had "yell[ed] obscene things in their direction and to them." (Tr. Vol. 2 at 13). In response to the residents' pointing, Ruiz "start[ed] yelling at them." (Tr. Vol. 2 at 14).

[8] When Officer Wright approached Ruiz to speak to him, she saw that he had "extremely red, glassy . . . blood shot eyes" and noticed that his "speech was extremely slow and slurred." (Tr. Vol. 2 at 10). She also noticed that Ruiz smelled of an alcoholic beverage and that he had a pint-sized bottle of vodka in his jeans pocket. Officer Wright gave Ruiz a portable breath test. Ruiz initially refused to give the officer his name. He was "furious" and had a "little attitude" with her. (Tr. Vol. 2 at 28, 29). Based on Ruiz's intoxication and the circumstances, including the "first shift officers having gone out on him twice . . . just two hours prior to [her dispatch] call[,]" Officer Wright ultimately arrested him. (Tr. Vol. 2 at 13).

[9] The State charged Ruiz with Class B misdemeanor public intoxication. The charging information alleged, in relevant part, that Ruiz had "either breached the peace or was in imminent danger of breaching the peace" under INDIANA CODE § 7.1-5-1-3(a)(3). (App. Vol. 2 at 7).

[10] On January 9, 2017, the trial court held a bench trial. The State presented testimony from Officer Wright, who focused mainly on the facts regarding

Ruiz's actions during the third dispatch to the apartments. After the State's presentation of evidence, Ruiz moved for an involuntary dismissal.[3] Ruiz argued that the officer's testimony that she saw Ruiz yelling at the residents who had been pointing him out and her lack of testimony as to how long he yelled did not rise to the level of a breach of the peace. The trial court denied Ruiz's motion.

[11] Thereafter, Ruiz testified on his own behalf. Ruiz acknowledged that he had been drinking alcohol in the morning at the Rally's and that the police had come to the scene multiple times, given him a breathalyzer test, and told him to stay in his apartment. Ruiz further testified that he had "refused to listen to them" and left his apartment. (Tr. Vol. 2 at 27). He also testified that when Officer Wright had come to the scene, he had been "furious" and had "a little attitude" with her. (Tr. Vol. 2 at 28, 29).

[12] Thereafter, the State recalled Officer Wright to offer rebuttal testimony. The officer testified about the two dispatch calls and complaints about Ruiz "yelling racial slurs" and "causing a disturbance[.]" (Tr. Vol. 2 at 31).

[13] During closing arguments, Ruiz's counsel contended that Officer Wright's direct observation of Ruiz's actions during the third dispatch call (i.e., yelling

---

[3] Ruiz referred to his dismissal request as a directed verdict, which applies to "a case tried before a jury[.]" Ind. Trial Rule 50(A). Because Ruiz had a bench trial, his dismissal request will be referred to as a motion for involuntary dismissal. *See* Ind. Trial Rule 41(B) (referring to a defendant's request for dismissal "in an action tried by the court without a jury[.]").

and being "aggravated with the officer") did not "rise to the level of breach of the peace." (Tr. Vol. 2 at 33). He argued that, at the time Officer Wright came to the scene, he "wasn't breaching the peace" and "wasn't in danger of . . . breaching the peace[.]" (Tr. Vol. 2 at 33). Ruiz suggested that Officer Wright was required to witness him breaching the peace or being in danger of breaching the peace at the time she saw that he was intoxicated in a public place.

[14] The State argued in rebuttal that the evidence was sufficient to find Ruiz guilty of public intoxication. The State pointed out that Officer Wright, who had been "reasonably aware as to the prior conduct" of Ruiz, responded to "yet another call . . . regarding the same defendant where upon the complaint [wa]s [that] he [wa]s breaching the peace" and found Ruiz "in a public place in a state of intoxication." (Tr. Vol. 2 at 34).

[15] The trial court found Ruiz guilty as charged. When entering its verdict, the trial court specifically addressed Ruiz's argument regarding the evidence of the breach of peace element as follows:

> [Ruiz's counsel's] point is well taken uh as to the element of breaching the peace and being observed. Um, and with misdemeanors it, it is required basically that the officer see the offense taking place. However, the statute as charged says that it was either breaching the peace or an imminent danger of doing so. In this case[,] we've got a situation where I'm not in much doubt that Mr. Ruiz was intoxicated by his own testimony he was basically sitting on the picnic tables at Hardee's [sic] which is not only a public place but, a public place that was probably not designed for the residents of the adjacent apartment complex to

sit and drink alcohol. Um and when the witness, when the officer showed up[,] there had been two other, two other previous calls. Now [sic] didn't have any personal knowledge of what happened but, she does show up and she knows there had been two other calls. There is some yelling going back and forth, uh and uh her observation would lead her to believe that Mr. Ruiz is intoxicated. I think it's perfectly reasonable to believe that Mr. Ruiz was an imminent danger of breaching the peace if she didn't actually see him doing so in that instant. I'm going to find Mr. Ruiz guilty. I think the evidence supports that.

(Tr. Vol. 2 at 34-35). The trial court imposed a six (6) month suspended sentence. Ruiz now appeals.[4]

# Decision

[16]     Ruiz argues that the evidence was insufficient to support his conviction for Class B misdemeanor public intoxication.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder would find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence

---

[4] We note that Ruiz's counsel has included a copy of the trial transcript in the Appellant's Appendix. We direct counsel's attention to Indiana Appellate Rule 50(F), which provides that "parties should not reproduce any portion of the transcript in the Appendix" because the "[t]ranscript is transmitted to the Court on Appeal pursuant to Rule 12(B)[.]"

> overcome every reasonable hypothesis of innocence. The
> evidence is sufficient if an inference may reasonably be drawn
> from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original). Additionally, our Indiana Supreme Court has explained that "when determining whether the elements of an offense are proven beyond a reasonable doubt, a fact-finder may consider both the evidence *and the resulting reasonable inferences*." *Thang v. State*, 10 N.E.3d 1256, 1260 (Ind. 2014) (emphasis in original).

[17] "Indiana has historically recognized that the purpose of the public intoxication statute 'is to protect the public from the annoyance and deleterious effects which may and do occur because of the presence of persons who are in an intoxicated condition[.]'" *Morgan v. State*, 22 N.E.3d 570, 576 (Ind. 2014) (quoting *State v. Sevier*, 117 Ind. 338, 20 N.E. 245, 246-47 (1889)). In 2012, our legislature amended the public intoxication statute, INDIANA CODE § 7.1-5-1-3, "to add the four conduct elements to the definition of public intoxication so that it is no longer a crime to simply be intoxicated in public." *Milam v. State*, 14 N.E.3d 879, 881 (Ind. Ct. App. 2014). *See also Stephens v. State*, 992 N.E.2d 935, 938 (Ind. Ct. App. 2013). Our Indiana Supreme Court explained that "[t]he legislature's modifications to the Public Intoxication statute were in apparent response to th[e] [Indiana Supreme] Court's decision in 2011 that affirmed the conviction of an automobile passenger for Public Intoxication." *Thang*, 10 N.E.3d at 1260 (citing *Moore v. State*, 949 N.E.2d 343 (Ind. 2011)). The

additional elements in INDIANA CODE § 7.1-5-1-3(a)(1)-(4) "promote[] public policy encouraging inebriated persons to avoid creating dangerous situations by walking, catching a cab, or riding home with a designated driver rather than driving while intoxicated." *Stephens*, 992 N.E.2d at 938. "[T]he amended statute reflects . . . that . . . '"[t]he spirit of the public intoxication statute is to prevent people from becoming inebriated and then bothering and/or threatening the safety of other people in public places."'" *Holbert v. State*, 996 N.E.2d 396, 401 (Ind. Ct. App. 2013) (quoting *Jones v. State*, 881 N.E.2d 1095, 1098 (Ind. Ct. App. 2008) (quoting *Wright v. State*, 772 N.E.2d 449, 456 (Ind. Ct. App. 2002))), *trans. denied*.

[18] The amended public intoxication statute in effect at the time of Ruiz's crime, provided, in relevant part, as follows:

> . . . it is a Class B misdemeanor for a person to be in a public place . . . in a state of intoxication caused by the person's use of alcohol . . . , if the person:
>
> > (1) endangers the person's life;
> >
> > (2) endangers the life of another person;
> >
> > (3) breaches the peace or is in imminent danger of breaching the peace; or
> >
> > (4) harasses, annoys, or alarms another person.

I.C. § 7.1-5-1-3(a). To convict Ruiz as charged, the State was required to prove beyond a reasonable doubt that Ruiz was in a public place in a state of

intoxication and that he breached the peace or was in imminent danger of breaching the peace.

[19] The public intoxication statute does not define the terms, breach of peace or imminent danger. Nor has our Indiana Supreme Court defined these terms in conjunction with the amended public intoxication statute.[5] Our Court has, on occasion, defined a breach of peace by borrowing language from our Indiana Supreme Court's footnote in *Price v. State*, 622 N.E.2d 954, 960 n.6 (Ind. 1993), *reh'g denied*, a case in which our supreme court discussed the disorderly conduct statute.[6] *See Brown v. State*, 12 N.E.3d 952, 954 (Ind. Ct. App. 2014) (reviewing public intoxication statute); *Lemon v. State*, 868 N.E.2d 1190, 1194 (Ind. Ct. App. 2007) (reviewing citizen's arrest statute). In that footnote, the *Price* Court rejected the State's request to recognize the disorderly conduct statute as a breach of peace statute and stated as follows:

> Some portions of Ind. Code Ann. § 35-45-1-3 [the disorderly conduct statute] embody common law breach of peace provisions, *see, e.g.,* Ind. Code Ann. § 35-45-1-3(1) (engaging in fighting or tumultuous conduct), but we decline the State's invitation to characterize § 35-45-1-3(2) as a breach of the peace or "fighting words" statute. *Hornbook law counts violence-either actual or threatened-as an essential element of breaching the peace.* 11

---

[5] Our Indiana Supreme Court has addressed the endangerment of self and others conduct elements of the amended public intoxication statute in *Thang v. State*, 10 N.E.3d 1256 (Ind. 2014) and the harasses, annoys, or alarms another person element in *Morgan v. State*, 22 N.E.3d 570 (Ind. 2017).

[6] The disorderly conduct statute provides that "[a] person who recklessly, knowingly, or intentionally: (1) engages in fighting or tumultuous conduct; (2) makes unreasonable noise and continues to do so after being asked to stop; or (3) disrupts a lawful assembly of persons . . . commits disorderly conduct, a Class B misdemeanor." IND. CODE § 35-45-1-3(a).

C.J.S. *Breach of the Peace* §§ 2 & 3 (1938). None of Indiana's breach of the peace statutes permitted prosecution based on expression alone. *See, e.g.,* ch. 6, Rev.Stats. of 1852, § 4 (riot), § 5 (rout), § 37 (disturbing meetings), § 19 (barratry). While it was an offense in Indiana to give a verbal or oral challenge to a duel, *State v. Perkins* (1841), 6 Blackf. 20, this was so because the challenger intended to excite the other to violence. 28 C.J.S. *Dueling* § 1 (1941) (challenges tend to provoke breaches of peace).

Section 35-45-1-3(2) is aimed at the intrusiveness and loudness of expression, not whether it is obscene or provocative. Indeed, one could violate the section by "reading the scriptures in an unreasonably loud manner," *Mesarosh v. State* (1984), Ind. App., 459 N.E.2d 426, 430 (Young, J., concurring), or "exploding firecrackers in the middle of the night." Model Penal Code § 250.2(1)(b) comment 4(a). The State thus adds nothing to its case by attaching the labels "obscene" or "fighting words" to Price's speech. Instead, if Price was truly taunting the officer (or anyone else) with "fighting words," then provocation, Ind. Code Ann. § 35-42-2-3 (West 1986), should have been charged.

*Price*, 622 N.E.2d at 960 n.6 (emphasis added). "[O]ur supreme court has not specifically elaborated upon what actions would constitute violence sufficient to create a breach of the peace[.]" *Lemon*, 868 N.E.2d at 1194.

[20] Nevertheless, our Court has more frequently relied upon prior caselaw dealing with citizens' arrests to define breach of peace. Specifically, we have explained that a "'breach of the peace includes all violations of public peace, order or decorum.'" *Lemon*, 868 N.E.2d at 1194 (quoting *State v. Hart*, 669 N.E.2d 762, 764 (Ind. Ct. App. 1996) *(citing Census Fed. Credit Union v. Wann*, 403 N.E.2d 348, 350 (Ind. Ct. App. 1980))). A breach of peace "is a violation or

disturbance of the public tranquility or order and includes breaking or disturbing the public peace by any riotous, forceful, or unlawful proceedings." *Lemon*, 868 N.E.2d at 1194. "Thus, a breach of the peace may involve other offenses." *Id.; see, e.g., Hart*, 669 N.E.2d at 764 (holding that a person who operates a motor vehicle while intoxicated commits a breach of the peace).

[21] Ruiz does not dispute that he was intoxicated in a public place. Instead, he contends that there was no evidence to support the trial court's determination that he was in imminent danger of breaching the peace. He contends that the State was required to show that he "was likely to become violent or riotous, as would be necessary to be in imminent danger of breaching the peace." (Ruiz's Br. 10). We disagree.

[22] Here, the record reveals that Ruiz started drinking vodka in the morning with a few friends while sitting at some picnic tables at a Rally's near the apartments. In the afternoon, the police were dispatched to the apartments on three separate occasions based on complaints regarding Ruiz's behavior. Within a twenty-minute period, residents called police two different times to report that an intoxicated Ruiz was "yelling racial slurs at the caller" and then "causing a "disturbance[.]" (Tr. Vol. 2 at 31). Officers instructed Ruiz to stay in his apartment, but he "refused to listen to them" and left his apartment, which led to the third dispatch call. (Tr. Vol. 2 at 27). When Officer Wright responded to the third dispatch call, she was aware that there had been two recent dispatch calls to the apartment complex for complaints about Ruiz. After a few of the

apartment residents, who were standing approximately two hundred feet away from Ruiz, pointed toward Ruiz and yelled to inform the officer that "that was the guy" who had "yell[ed] obscene things . . . to them[,]" Ruiz started yelling at them. (Tr. Vol. 2 at 13). When Officer Wright spoke to Ruiz, he initially refused to give the officer his name. Ruiz smelled of alcohol and had blood shot eyes, slurred speech, and trouble keeping his balance. Ruiz admitted during his testimony that he was "furious" and had "a little attitude" with Officer Wright. (Tr. Vol. 2 at 28, 29).

[23] The trial court weighed this evidence and determined that it was "perfectly reasonable to believe that Mr. Ruiz was an imminent danger of breaching the peace[.]" (Tr. Vol. 2 at 35). Based on the evidence presented, it was reasonable for the trial court, as factfinder, to draw an inference that Ruiz—who was undoubtedly intoxicated in a public place; had behaved in a manner that required the police to come two previous times to respond to residents' complaints about Ruiz; was yelling at residents; was admittedly "furious" and had a "little attitude" with the officer; and was being uncooperative with the officer—was in imminent danger of breaching the peace or disturbing the public tranquility when Officer Wright responded for a third time to the apartments. *See Thang*, 10 N.E.3d at 1260 (explaining that "when determining whether the elements of an offense are proven beyond a reasonable doubt, a fact-finder may consider both the evidence *and the resulting reasonable inferences*") (emphasis in original). *See also Drane*, 867 N.E.2d at 146 (explaining that when we "must consider only the probative evidence and reasonable inferences *supporting* the

verdict") (emphasis in original).  Accordingly, we affirm his public intoxication conviction.  *See, e.g.*, *Thang*, 10 N.E.3d at 1260 (affirming the defendant's public intoxication conviction where the evidence and reasonable inferences supported the conviction).

Affirmed.

Riley, J., and Robb, J., concur.